THE MUTUAL FINANCE CO., APPELLANT, *v.* MUNICIPAL EMPLOYEES UNION LOCAL NO. 1099, APPELLEE.

342

*Messrs. Marshman, Hollington & Steadman* and *Mr. William F. Snyder*, for appellant.
*Messrs. Cozza & Steuer*, for appellee.

KOVACHY, J. This is an appeal on questions of law and fact from a judgment entered in the Court of Common Pleas.

Plaintiff, Mutual Finance Company, hereinafter referred to as "Mutual," brought an action in replevin to recover possession of four motor vehicles in the possession of the defendant, Municipal Employees Union, Local No. 1099, hereinafter referred to as "Municipal." Municipal filed a cross-petition seeking an order compelling Mutual to assign the title to the vehicles in question to Municipal and other equitable relief.

A restraining order was granted on the cross-petition against Mutual and the Sheriff of Cuyahoga County, preventing the latter from taking possession of the motor vehicles.

The trial court found against Mutual, dismissed its petition and rendered judgment in favor of Municipal on its cross-petition, decreeing "that the plaintiff deliver to the defendant manufacturer's statements of origin for four 1959 Chrysler automobiles—free and clear of any and all liens subject only to the retail mortgages executed by the defendant in favor of the plaintiff * * *."

The cause comes to us on the transcript of the proceedings in the trial court, briefs and arguments of counsel.

There is little dispute with respect to the basic facts. Mutual is engaged in the business of financing automobiles. One category of its business is known as wholesale or floor-plan financing in which capital is advanced to automobile dealers on their inventory of motor vehicles. Another category of its business is known as retail financing, and this consists of loaning money to customers who purchase automobiles from dealers and are unable to pay the full price. Mutual financed all the inventory, both new and used late model automobiles, of N. J. Popovic, Inc., a dealer holding a franchise from the Chrysler Corpora-

tion, hereinafter referred to as "Popovic." Mutual had been the exclusive moneylender to Popovic for some ten years. Popovic's indebtedness on floor-plan mortgages, at times, ran as high as a quarter of a million dollars.

In January, 1958, Popovic found itself in financial difficulties. An investigation by Mutual showed that it had failed to turn over the proceeds from the sales of four automobiles. Mutual helped Popovic by advancing as a capital loan the sum of $18,257.95, secured by a first mortgage on all furniture and fixtures, to be paid back at the rate of $90 on each car sold. At the commencement of this action, that indebtedness had been reduced to $600. Mutual, at that time, also, arranged that the manufacturer's statement of origin for each motor vehicle sold to Popovic by the Chrysler Corporation be sent directly to it together with a draft in the amount of the cost of such motor vehicle. The evidence also shows that Popovic was again in financial difficulties in October of 1958, at which time a conference was held between representatives of the Chrysler Corporation, Mr. Winston, the president of Mutual, and N. J. Popovic, president of Popovic. Mutual agreed to continue financing all new automobiles sold Popovic by the Chrysler Corporation, provided N. J. Popovic invest a sum of $25,000 of his own money in Popovic. This was done. Mutual also at that time limited the number of vehicles to be sold to Popovic.

Under the floor-plan arrangement, Mutual received a note and mortgage executed by Popovic in exchange for the money paid by it to the Chrysler Corporation. These instruments designated the motor vehicles by number and the amount of money loaned on each. The floor-plan mortgage provides:

"That the said mortgagor may sell each of said chattels in the regular course of his retail trade at its usual retail price for cash or upon such terms and conditions as the mortgagee may approve in writing; that in the event the mortgagor so sells any one or more of such chattels the proceeds of each such sale, and the evidence thereof in whatever form the same may be, shall be the property of the mortgagee and shall be held in trust by the mortgagor for the use and benefit of the mortgagee and the mortgagor agrees as such trustee to deliver such proceeds and such evidence of sale immediately upon its receipt thereof to the

mortgagee to be applied by it toward the reduction of the indebtedness secured by this mortgage."

When a dealer fails to carry out the provision of the mortgage requiring immediate delivery of the proceeds of a sale to the mortgagee, it is said to be "out of trust." Mutual had a power of attorney from Popovic to sign these floor-plan chattel mortgages. It was the practice of Mutual to make a monthly floor check on all automobiles at Popovic and to ask for an explanation for automobiles that were not on the floor at the time. The floor checks from April 1958, to March 1959, inclusive, record no automobiles "out of trust," though some were missing at all times, for which an explanation that "the purchaser has not yet paid for the car," "the purchaser is making arrangements with a financial institution to pay for the car," "the purchaser will pay by" a certain date, or "the car has been loaned out," was made by Popovic. These explanations were noted by the investigator and apparently accepted at face value by the officials of Mutual. On April 7, 1959, N. J. Popovic personally told Mr. Winston over the telephone that Popovic was "out of trust." A floor check was immediately ordered by Mr. Winston, from which it developed that 22 automobiles were "out of trust" of a total of 46 new and 31 used automobiles covered by floor-plan mortgages. Mr. Winston testified that, with the exception of January 1958, he had no knowledge that Popovic was "out of trust" at any time nor reason to fear or suspect that Popovic was not living up to its full obligation with respect to the floor-plan mortgages.

The wholesale or floor-plan financing of automobiles is not the most profitable business of finance companies and involves considerable risk. The finance companies, however, engage in such financing in order to obtain the retail financing of automobiles, which is a source of great profit. Mutual's retail financing of automobiles sold by Popovic aggregated three to four times the money loaned Popovic on floor-plan mortgages.

Mr. Popovic testified that Popovic was technically "out of trust" from two days to two weeks most of the time during the years 1958 and 1959. He also testified that he had the books and records of Popovic at the October 1958 meeting, which disclosed that Popovic was "out of trust" at that time and that Mr. Win-

ston knew that Popovic was "out of trust" in November and December of 1958.

Mr. Winston denied this. He testified that the expression "out of trust" was "poison" to him and that any time he had any knowledge or information that led him to believe that Popovic was "out of trust" he would take action immediately. He also testified that Mutual is "much more careful in checking cars in floor planning where they do not hold title." The statement by Mr. Popovic that Mutual knew Popovic was "out of trust" in November and December is a mere conclusion without any supporting evidence and cannot have any probative value in the face of Mr. Winston's denial and, particularly, in view of his record of action whenever he had information that Popovic was "out of trust." The facts are that he corrected the "out of trust" situations in January and October of 1958, and acted immediately and precipitously upon obtaining information on April 7, 1959, that Popovic was "out of trust."

If it be true, as Mr. Popovic testified, that Popovic was "out of trust" all during 1958 and part of 1959, there is no probative evidence in the record that Mutual had actual knowledge of it, with the exception of the three occasions noted above. Moreover, with the exception of the current cases, there is no evidence that Popovic failed to furnish a certificate of title to any purchaser during 1958 and 1959. And the current cases *all* involve automobiles delivered to purchasers in March and early April, 1959.

Mutual repossessed all automobiles floor-planned on the premises of Popovic on April 7, and on April 23 instituted replevin actions to obtain possession of some 18 automobiles sold by Popovic and on which, at the time, it was "out of trust."

In January 1959, Municipal discussed the purchase of four new Chrysler automobiles with Popovic. Popovic agreed to accept four used Chrysler automobiles as part payment and, by telephone, obtained the consent of Mutual to the same as well as a commitment to loan Municipal the cash necessary to complete the transaction. The trade-in allowances on these 1957 automobiles were $2,084.60, $2,043.40, $2,111.85 and $2,053.70.

Municipal, in February, 1959, assigned the certificates of title to these four automobiles to Popovic with the understand-

ing that Municipal could continue to drive them until the new automobiles arrived from the factory. Mutual was informed of these arrangements and advanced Popovic the sum of $5,400 on February 16, 1959, as a floor-plan loan on the used automobiles. On April 24, Mutual received certificates of title in its name to these used automobiles. The new 1959 Chrysler automobiles were delivered to Popovic in March and April. Mutual received the manufacturer's statement of origin and honored the drafts to cover their cost. Popovic furnished Mutual a note and mortgage in the amount of the drafts. Mutual, thereafter, honored four drafts upon it by Popovic for the balance of the purchase price and received notes and mortgages from Municipal to cover the retail loans extended to it. The following schedule sets forth these details:

| Serial | | Wholesale Draft (New Chryslers) | | Retail Draft (New Chryslers) |
|---|---|---|---|---|
| M 551106079 | 3-13-59 | $ 3747.05 | 3-16-59 | $2250.00 |
| M 551107197 | 3-30-59 | 3802.20 | 4-3-59 | 2250.00 |
| M 551107199 | 3-30-59 | 3909.35 | 4-3-59 | 2300.00 |
| M 551106736 | 4-1-59 | 3747.05 | 4-1-59 | 2250.00 |
| | | $15,205.65 | | $9050.00 |

It appears from the above that Mutual holds notes and mortgages in the sum of $15,205.65 for floor-planning the new automobiles, $9,050 for retail financing them, $5,400 for floor-planning the used automobiles, and certificates of title to the used automobiles at a trade-in value of $8,293.55, for a grand total of $37,949.20.

Mutual bases its right to the possession of the four 1959 Chrysler automobiles on its floor-plan mortgage, and the fact that it is holding the manufacturer's statements of origin.

The evidence is plain that Popovic received full payment for the four 1959 Chrysler automobiles through a trade-in of four used automobiles and cash provided under the retail mortgages by Mutual. Popovic, under the floor-plan mortgage, was obligated to deliver this cash immediately and the certificates of

title of the trade-ins to Mutual. It did transfer the certificates of title but failed to deliver the cash. The floor-plan mortgage, to that extent, is in default, and as a consequence Mutual has a *legal* right to the possession of the four 1959 Chrysler automobiles now in the hands of Municipal unless Municipal shows some right that is superior to it or supersedes it or presents a defense based on equitable considerations that nullifies it as to Municipal.

Municipal bought these automobiles in the usual course of business from an authorized dealer which exhibited them for sale on the floor of its automobile establishment with the express permission of the mortgagee. It had no notice whatever that the automobiles were mortgaged when it paid for their purchase. It, therefore, maintains that it was a bona fide purchaser without notice and as such entitled to have the floor-plan mortgage declared null and void as to it.

Under the so-called "Floor Plan Doctrine," a floor-plan "* * * mortgage is void as against a bona fide purchaser without notice, on the theory that, notwithstanding the conditions of the mortgage and its record, an inference of apparent authority in the dealer to sell arises from the fact of his permission to exhibit the property, estopping and precluding the mortgagee from asserting the mortgage against such person." 9 Ohio Jurisprudence (2d), 242, Section 112.

Since the floor-plan rule became the prevailing doctrine in Ohio, the Legislature has passed the Certificate of Motor Vehicle Title Law, effective January 1, 1938. As a consequence, we are squarely faced with the questions, what impact, if any, the Certificate of Motor Vehicle Title Law has on the floor-plan doctrine as far as motor vehicles are concerned.

Sections of the Certificate of Motor Vehicle Title Law pertinent to such consideration read:

Section 4505.03, Revised Code. "No person, except as provided in Section 4505.05 of the Revised Code, shall sell or otherwise dispose of a motor vehicle without delivering to the purchaser or transferee thereof a certificate of title with such assignment thereon as is necessary to show title in the purchaser; nor shall any person purchase or otherwise acquire a motor vehicle without obtaining a certificate of title for it in his name in

accordance with Sections 4505.01 to 4505.19, inclusive, of the Revised Code."

Section 4505.04, Revised Code. "No person acquiring a motor vehicle from the owner thereof, whether such owner is a manufacturer, importer, dealer, or otherwise, shall acquire any right, title, claim, or interest in or to said motor vehicle until such person has had issued to him a certificate of title to said motor vehicle, or delivered to him a manufacturer's or importer's certificate for it; nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title, or manufacturer's or importer's certificate for said motor vehicle, for a valuable consideration.

"No court in any case at law or in equity shall recognize the right, title, claim or interest of any person in or to any motor vehicle sold or disposed of, or mortgaged or encumbered, unless evidenced:

"(A) By a certificate of title or a manufacturer's or importer's certificate issued in accordance with Sections 4505.01 to 4505.19, inclusive, of the Revised Code.

"(B) By admission in the pleadings or stipulation of the parties."

Section 4505.06, Revised Code.

"\* \* \*

"In the case of the sale of a motor vehicle by a dealer to a general purchaser or user, the certificate of title shall be obtained in the name of the purchaser by the dealer upon application signed by the purchaser. In all other cases such certificate shall be obtained by the purchaser. In all cases of transfers of motor vehicles, the application for certificate of title shall be filed within three days after the delivery of such motor vehicle.

"\* \* \* \*"

Section 4505.13, Revised Code. "Sections 1319.01 to 1319.16, inclusive, of the Revised Code, do not permit or require the deposit, filing, or other record of a chattel mortgage, conveyance intended to operate as a mortgage, trust receipt, conditional sales contract, or other similar instrument, or any copy of same, covering a motor vehicle. Any mortgage, conveyance intended to operate as a mortgage, trust receipt, conditional sales contract, or other similar instrument covering a

motor vehicle, if such instrument is accompanied by delivery of a manufacturer's or importer's certificate and followed by actual and continued possession of such certificate by the holder of said instrument, or, in the case of a certificate of title, if a notation of such instrument has been made by the Clerk of the Court of Common Pleas on the face of such certificate, shall be valid as against the creditors of the mortgagor, whether armed with process or not, and against subsequent purchasers, mortgagees, and other lienholders or claimants. * * *.''

Inasmuch as ignorance of the law is no excuse, it must be presumed that the defendant as well as the plaintiff knew the provisions of these laws and that both were bound to observe them and be governed by them.

An automobile is a highly mobile chattel which can be easily transported to other parts of the country with a ready resale value. The Legislature enacted these laws to prevent the trafficking in stolen automobiles. The concept was to devise a system of registration which would reveal the true owner of the vehicle and disclose all liens attaching. It provides for one document to be registered with the Clerk of the Common Pleas Court to proclaim ownership and embody liens. The language used in these statutes is clear, unambiguous, and unequivocal and, under the decisions of the Supreme Court of Ohio, must be given a *literal* interpretation, because it "means exactly what it says." *Garlick* v. *McFarland*, 159 Ohio St., 539, 113 N. E. (2d), 92; *In re Estate of Case*, 161 Ohio St., 288, 118 N. E. (2d), 836; *Kelley Kar Co.* v. *Finkler*, 155 Ohio St., 541, 99 N. E. (2d), 665; *Mielke* v. *Leeberson*, 150 Ohio St., 528, 83 N. E. (2d), 209, 7 A. L. R. (2d), 1342.

Municipal is presumed to have known that it was required to have a certificate of title before it could "acquire any right, title, claim or interest in or to said motor vehicle" and that no court can "recognize the right, title, claim or interest of any person in or to any motor vehicle" unless such title was obtained.

Popovic knew that it could not comply with the law in obtaining certificates of title for the new automobiles in the name of Municipal without manufacturer's statements of origin in its possession.

Municipal is presumed to have known that Popovic was in no position to carry out its responsibility of providing certificates of title to the automobiles in its name unless it had physical possession of the manufacturer's statements of origin.

Yet, Municipal purchased these automobiles and signed applications for certificates of title without ascertaining whether Popovic had physical possession of the manufacturer's statements of title.

Section 4505.13, Revised Code, unequivocally states that: "* * * Any mortgage * * * covering a motor vehicle, *if such instrument is accompanied by delivery of a manufacturer's * * * certificate and followed by actual and continued possession of such certificate by the holder of said instrument* * * * shall be valid* * * against subsequent purchasers* * *."* (Emphasis ours.)

Under the floor-plan rule, a floor-plan mortgage is declared void as against a bona fide purchaser without notice on equitable grounds through the application of the principle of estoppel, precluding the mortgagee from asserting its mortgage against such purchaser.

Under Section 4505.04, Revised Code, "No person acquiring a motor vehicle from the owner thereof * * * shall acquire any right, title, claim, or interest in or to said motor vehicle until such person has had issued to him a certificate of title to said motor vehicle * * *; *nor shall any waiver or estoppel operate in favor of such person against a person having possession of such * * * manufacturer's * * * certificate for said motor vehicle,* for a valuable consideration." (Emphasis ours.)

Now, Mutual not only holds the mortgage on these automobiles, but it holds the manufacturer's certificates as well and, under the clear language of the Certificate of Motor Vehicle Title Law, *no estoppel can operate against it in favor of a bona fide purchaser so long as it holds the manufacturer's certificates for the motor vehicles.* It necessarily follows, therefore, that the floor-plan mortgage on the four 1959 Chrysler automobiles is valid as against Municipal and that Mutual has a *legal* right to the possession of these automobiles.

The syllabus in *Crawford Finance Co.* v. *Derby*, 63 Ohio. App., 50, 25 N. E. (2d), 306 (Motion to certify overruled October 4, 1939), reads as follows:

"1. The holder of a chattel mortgage on and a manufacturer's certificate of title to an automobile given to him by a dealer, has a lien on the automobile superior to any claim of a subsequent buyer of it from that dealer.

"2. A chattel mortgage on a motor vehicle given by a dealer and accompanied by the manufacturer's certificate of title to such mortgaged vehicle, cannot be filed or recorded or registered by the holder, as long as he holds the certificate of title.

"3. The Ohio certificate of title law for the registration of titles to motor vehicles, Sections 6290-2 to 6290-20, General Code, is exclusive, and the only way a buyer can acquire a good title to such a vehicle from a dealer is by procuring a certificate of title from the proper clerk of courts as provided for in Sections 6290-3, 6290-4 and 6290-5, General Code.''

See, *Associates Investment Co.* v. *LeBoutillier*, 69 Ohio App., 62, 42 N. E. (2d), 1011 (Motion to certify overruled February 11, 1942).

The Certificate of Motor Vehicle Title Law, accordingly, creates an exception to the floor-plan rule by declaring the mortgage ''valid as against * * * subsequent purchasers * * *,'' if the mortgage ''is accompanied by delivery of a manufacturer's * * * certificate and followed by actual and continued possession of such certificate by the holder of said instrument.'' (Section 4505.13, Revised Code.)

If Mutual prevails on its petition for replevin, however, Municipal will not only be deprived of the use of the four Chrysler automobiles but will be required to make all payments on its retail mortgage loan on them from Mutual.

Would such a consummation be equitable here?

Mutual bottoms its replevin action on its floor-plan mortgage. This mortgage would have been liquidated had Popovic carried out its provisions requiring Popovic to forward all proceeds of the sale *immediately* to Mutual. Mutual consented to the acceptance of four used automobiles as part payment and provided the money to Municipal to complete the sale. Mutual, thus, arranged for the liquidation of the floor-plan mortgage, since the money it provided and the four automobiles traded in were the purchase price for the new automobiles and constituted the proceeds belonging to Mutual under its floor-plan mortgage.

Popovic drew a draft on Mutual in the amount of the retail loan. This was honored by Mutual. Popovic's obligation was to deliver this money with certificates of title immediately to Mutual in liquidation of the floor-plan mortgage. When it failed to do so, it misapplied funds belonging to Mutual and at the same time thwarted its own ability to fulfill the requirements of the law to obtain certificates of title for Municipal. These acts were fraudulent.

The facts presented in the transcript of evidence before us do not warrant the conclusion that Mutual knowingly or intentionally tolerated such action on the part of Popovic. There is no actual or active fraud shown on the part of Mutual in these transactions, and the Common Pleas Judge, who had the advantage of seeing and hearing the witnesses, found "the evidence disclosed no malice or evil motive on the part of Mutual Finance Company."

A careful analysis of the March 1959 floor check shows that, at that time, 16 automobiles were missing from the floor of Popovic. The explanations given by Popovic and accepted by the investigators of Mutual were:

(1) Loaned out, including three automobiles loaned to Municipal—four.

(2) To be financed by financial organizations other than Mutual—six.

(3) To be paid for on some future day—five.

(4) Out at the time—one.

These 16 missing automobiles included five automobiles purchased by defendants in these cases. All five bear notations that payment for them will be made through a credit union or otherwise on some future date. Had Mutual made an inspection of Popovic's books, it would have discovered that Popovic was "out of trust" as to these automobiles. Such inefficient policing of automobiles on the floor of Popovic constituted negligence on the part of Mutual.

Since the manner in which the automobiles on the floor of Popovic were checked is illustrated in the March 1959 report and represents the pattern adhered to throughout 1958 and 1959, it is reasonable to conclude that Mutual's method of

policing the automobiles was highly faulty and clearly negligent throughout.

Mutual, by the exercise of due diligence, should have known of Popovic's financial distress when it turned the proceeds of Municipal's retail loan over to Popovic. Moreover, under the terms of the floor-plan mortgage, this money belonged to it to be applied toward the liquidation of that mortgage.

As to whether Mutual or Municipal should stand the loss of the misapplication of the money by Popovic, the loss must fall on Mutual under the well known equitable rule that where one of two persons must suffer by the fraud of a third person whom each trusted, the one who first trusted the third person and placed in his hands the means which enabled him to commit the wrong must suffer the loss. *McHenry* v. *Old Citizens' National Bank*, 85 Ohio St., 203, 97 N. E., 395, 38 L. R. A. (N. S.), 1111; *Wilson* v. *Hicks*, 40 Ohio St., 418; *Selser* v. *Brock*, 3 Ohio St., 302; *Koslen* v. *Lippincott Distributing Co.*, 22 Ohio Law Abs., 417; *Esselburn & Ellis, Inc.*, v. *Mazzagatti*, 11 Ohio Law Abs., 317.

Municipal avers in its cross-petition that the relationship of Mutual and Popovic was that of a joint venture. There is no basis for such claim under the facts of this case. *Bennett* v. *Sinclair Refining Co.*, 144 Ohio St., 139, 57 N. E. (2d), 776.

In its brief, Municipal maintains that Popovic was an agent of Mutual in the conductance of the automobile business. We believe the evidence to be conclusive that the relationship between Mutual and Popovic revolved entirely around money transactions. Mutual loaned money to Popovic to enable it to carry on its business as an automobile dealer. These loans were secured by mortgages. The mortgages recited the methods and means to liquidate the mortgages. In no sense did Mutual conduct or manage the general affairs of Popovic.

Mutual's wholesale or floor-plan mortgages on the four 1959 Chrysler automobiles, accordingly, are void and of no effect as to Municipal, and Mutual must fail in its action to recover possession of the automobiles now in the possession of Municipal. Mutual is required to effectuate the issuance of certificates of title in Municipal's name.

The petition for replevin is dismissed at plaintiff's costs, and a decree will be entered for defendant on the cross-petition.

*Judgment accordingly.*

HURD, P. J., and SKEEL, J., concur in the judgment and syllabus.