MUTUAL FINANCE CO., APPELLANT, *v.* KOZOIL, APPELLEE.*

502

*Messrs. Marshman, Hollington & Steadman* and *Mr. William F. Snyder*, for appellant.
*Messrs. Cozza & Steuer*, for appellee.

SKEEL, J. This is an appeal on questions of law and fact. The action filed in the trial court was one in replevin seeking immediate possession of a 1959 Chrysler automobile which the defendant, Kozoil, had purchased from N. J. Popovic, Inc. The plaintiff claimed the right to possession by the terms of a (wholesale) chattel mortgage (including other automobiles) executed by or for Popovic to the plaintiff and by reason of its possession of the manufacturer's certificate or statement of origin, made out in the name of N. J. Popovic, Inc., delivered directly to the plaintiff by Chrysler Corporation at the time plaintiff paid Chrysler for the automobile. The mortgage was given to secure a note dated March 30, 1959, executed by or for N. J. Popovic, Inc., in the sum of something over twenty thousand dollars in payment for six Chrysler automobiles (one of which was the one sold to the defendant Kozoil).

This defendant filed an amended answer and cross-petition and N. J. Popovic, Inc., was made a new party defendant. The amended answer denies that plaintiff is entitled to immediate possession of said Chrysler automobile and denies that he, the answering defendant, has wrongfully detained it, and alleges that the plaintiff wrongfully detains the certificate of title of the automobile from this answering defendant.

By his amended cross-petition, this answering defendant alleges that the plaintiff is engaged in the business of financing the sale of automobiles, both at wholesale for dealers and at retail for individual purchasers. It is alleged that N. J. Popovic, Inc., is an Ohio Corporation engaged in selling new and used

automobiles and holds a franchise from the Chrysler Corporation. It is alleged that Mutual and Popovic were engaged in a joint venture in the sale of motor vehicles at retail, Mutual furnishing money to finance the wholesale purchase of motor vehicles from Chrysler on mortgages signed by or for Popovic to the plaintiff and on occasion to finance retail sales by Popovic to purchasers from the agency.

It is alleged further that, through their working agreement, the plaintiff acquired and held the manufacturer's statement or certificate of origin on all Chrysler automobiles purchased by plaintiff on behalf of defendant N. J. Popovic, Inc.; that among the Chryslers purchased by plaintiff for Popovic was a new 1959 Windsor M 511-112066. The draft drawn on plaintiff by Chrysler in payment on this automobile had attached the manufacturer's statement of origin, which plaintiff now holds in its possession.

This answering defendant alleges that he purchased the automobile from Popovic for $3,527.08, $3,325.60 in cash and $201.48 by turning in a 1951 Chrysler. It is alleged that this transaction was brought to the attention of the plaintiff and that the money paid was received by the plaintiff or on its behalf but that plaintiff nevertheless refused to issue a certificate of title to this answering defendant as required by law.

It is alleged that at all times herein set forth the plaintiff and defendant Popovic, by their working agreement, were joint venturers for the purchase and sale of automobiles, by reason whereof the plaintiff is bound by the acts of N. J. Popovic, Inc., insofar as this defendant is concerned; that this answering defendant has demanded his certificate of title from Popovic, as was agreed when he received delivery of his automobile, but that Popovic has refused defendant's demand; that this transaction in all its details was well known to the plaintiff, as were other like transactions; that, through its negligence, it permitted Popovic to deal with the public on a cash basis without the possibility of delivering title to automobiles sold for cash because such title documents were in the possession of plaintiff; and that the plaintiff, although fully advised of this defendant's purchase of the automobile shortly after March 28th, has never required Popovic to pay to it the amount collected from this defendant under their joint venture.

It is alleged that the plaintiff had full knowledge of Popovic's financial distress and of its default to the plaintiff in failing to remit payments on cash sales over a long period before and during the time of this transaction, but nevertheless it aided and permitted Popovic to acquire, hold, display for sale and sell to this defendant and to others certain automobiles and to accept payment therefor, knowing full well it would not release or make available the certificate of title as provided by law; that as a result of plaintiff's negligence as aforesaid in permitting Popovic to sell automobiles and to receive money therefor without delivering titles, which titles were in the possession of plaintiff, Popovic was forced into bankruptcy, and has closed his places of business; that plaintiff is now claiming ownership of this defendant's automobile and is attempting to replevin it, although this defendant, to plaintiff's knowledge, has paid the full purchase price; and that the removal of the automobile from his possession will destroy his purchase money lien to his irreparable damage. It is alleged that this answering defendant has or will suffer damages directly due to the plaintiff's negligence as aforesaid. This defendant alleges that at the time he purchased the Chrysler from Popovic he was without knowledge of the business relationship between Mutual and Popovic, or that Popovic was in financial distress and in default to Mutual.

It is alleged in the alternative that since the plaintiff for a long period of time did purchase and pay for all automobiles to be exhibited for sale, with authority given to Popovic to sell, plaintiff was, in fact, the real owner and operator of said agency and Popovic acted as its agent in this transaction and received the amount paid by defendant on behalf of plaintiff, whereby this defendant, having paid his purchase price in full, is now entitled to the certificate of title for his automobile. Because of plaintiff's negligence and willful misconduct, this answering defendant asks $10,000 punitive damages and prays for the return of the purchase price or for the delivery to him of the legal title to his automobile.

The plaintiff filed a reply to this defendant's answer in the form of a general denial and an answer to his cross-petition which admits the first and second paragraphs of the cross-

petition, alleging plaintiff's corporate capacity and that of N. J. Popovic, Inc., but denies the existence of a joint venture, denies knowledge of the sale of the Chrysler automobile to this defendant, denies it received payments or interest on its mortgage lien and, for want of knowledge, denies this defendant's purchase, and generally denies negligence on its part and all other allegations of said cross-petition. There is no pleading on file by N. J. Popovic, Inc.

For more than eight years before April 1959 Mutual was the exclusive financial institution furnishing floor-plan or wholesale financing for N. J. Popovic, Inc., an authorized Chrysler automobile dealer. In many retail sales, unless otherwise financed by the purchaser, Mutual furnished the financing to purchasers from Popovic upon the security of the automobile involved.

Early in 1958, Popovic was experiencing financial difficulties. He had become "out of trust" on a number of sales by his failure to remit to Mutual the purchase price received by him on automobiles sold for cash. By "out of trust," in the automobile retail trade, is meant the failure of the dealer to remit money paid on cash purchases to the financial institution holding the wholesale or floor-plan mortgage on the automobile sold. This is usually made possible by the fact that on new cars purchased by a dealer, the manufacturer sends the manufacturer's statement of origin covering the automobiles delivered to the dealer so that he is enabled to procure a certificate of title under the certificate of title law of Ohio for delivery to a purchaser when a sale is made. If the dealer then sells an automobile covered by the wholesale mortgage and delivers the certificate of title to the purchaser, the wholesale mortgagee is without security and the dealer is "out of trust." The same result would obtain in the sale of used cars held by a dealer under a wholesale or floor-plan mortgage, where, of necessity, the dealer receives the certificate of title from the seller from whom he purchased the automobile, unless such title, when received by the dealer, is delivered to the wholesale mortgagee, or the lien of such floor-plan mortgage is noted on the certificate as is provided by Section 4505.13, Revised Code.

On January 17, 1958, because of Popovic's poor financial

state, and for the purpose of keeping him in business, Mutual Finance made a capital loan to Popovic of $18,257.95. Twelve thousand one hundred forty three dollars of the money loaned was to pay Mutual for money received by Popovic on cash sales of automobiles covered by a Mutual floor-plan or wholesale mortgage which Popovic had failed to remit to Mutual within a reasonable time after such money was received from the retail purchaser. The balance of the loan was used to reduce the amount of the floor-plan or wholesale mortgage lien on twelve used cars which were then a part of Popovic's used car inventory. Mutual thus received to its benefit every dollar of the loan. Although the president of Mutual testified at numerous places in the record that he did not know Popovic was not remitting money on automobiles sold for cash and was, therefore, "out of trust," he did testify to the use of the greater part of the money advanced on the capital loan. He said: "Those were cars that were sold by Popovic for which he had been paid and had not paid us."

From January 1958 until October, Popovic's financial position did not improve to the direct knowledge of Mutual. By Popovic's testimony, he was "out of trust" during all the last year of his operation, using monies received on immediate or current sales to pay on the accounts that were then in default, all to the knowledge of the officials of Mutual. The fact that he was in default on twenty-two automobiles when he was forced to close his business supports this conclusion. It is also a fact that Popovic remained in business at the will of Mutual to serve their purposes during the last year the agency was open.

After the capital loan of January 17, 1958, Mutual began to withhold titles from Popovic. In fact, it was arranged that Chrysler was to send the manufacturer's certificate of origin directly to Mutual, which practice continued until Popovic was closed by Mutual early in April of 1959. The president of Mutual testified on this point as follows:

"We started holding titles because we felt that his financial condition warranted our having a secured loan instead of an unsecured loan."

The practice prior to this was to permit Popovic to receive and use the manufacturer's certificates of origin.

Mutual policed the automobiles held by Popovic under Mutual's wholesale or floor-plan mortgages every month, or oftener, by what was called a floor-plan check. When automobiles for which Mutual had not been paid under its floor-plan mortgage were missing on such check, some explanation was called for, which was usually that the automobile had been loaned out or that payment had not yet been received, and the like, with no attempt on the part of Mutual to investigate further or determine or act upon the truth. The record reads as though Mutual expected Popovic to be "out of trust," and as long as they, Mutual, held the titles, their attitude was, as was said during the argument in this case, "let the buyer beware."

In October of 1958, because of Popovic's unstable financial condition, a meeting between Chrysler representatives, Mutual and Popovic was had where, as a price for the right to continue as a Chrysler dealer on a limited scale dictated and controlled by Mutual, Popovic was required to furnish additional capital for N. J. Popovic, Inc., in the sum of $25,000, with which demand Popovic complied. Popovic's testimony was that he put $25,000 back in the business. But, with the new capital, there is no indication in the record that his "out of trust" violations were less frequent or that Mutual took any steps to correct the untrue representations of Popovic, who, under the circumstances, and by the terms of the wholesale mortgage, hereinafter set out, was acting as agent for Mutual for the sale and collection of the cash for automobiles sold. They (Mutual) held the documents that showed title in Popovic, which they would not release until they were paid their wholesale mortgage liens. They knew Popovic was delivering cars and receiving money for sales under such circumstances that their own conduct would prevent him from the performance of his obligation to furnish a title upon the sale. Mutual did not seek a certificate of title noting its mortgage lien on the public record (certificate of title) with regard to new automobiles purchased for Popovic and mortgaged to them by their floor-plan mortgages. The public records were completely silent as to plaintiff's claims of either their ownership or lien rights on the automobiles they furnished Popovic. They supported Popovic in the conduct of the business and yet, in their own interests, prevented him from delivering titles as provided by law.

In the early part of April, Mutual finally ended their business relations with Popovic by taking over all of his inventory held on floor-plan or wholesale mortgages and all other property of Popovic under the capital loan mortgage of January 17, 1958, on which there was still a balance due of $600. At the time of this action by Mutual, Popovic was "out of trust" on twenty-two automobiles. There were also ten automobiles on which Mutual not only had a wholesale mortgage but had accepted the retail notes and mortgages of the purchasers and had paid Popovic the proceeds of such obligations instead of protecting the purchasers by first paying or securing themselves for the amount of their lien out of such proceeds. They forced Popovic into being what might be called "out of trust" on these automobiles, excusing their conduct by saying they had no doubt but that he would pay in due time, although they knew of his bad financial state and his continued "out of trust" conduct. The claim that they had no way of knowing of their interest in the automobiles sold at retail is completely without foundation in fact, particularly as to new cars, because they testified that they had a floor-plan or wholesale mortgage on every new automobile delivered at their instance to Popovic by Chrysler. If they did not know, they are certainly charged with knowledge of the obvious facts and those clearly apparent. The showing of plaintiff's conduct in accepting and paying drafts of Popovic, knowing him to be "out of trust," for fear that not to accept them, as had been their practice, would force him out of business, certainly is no answer to defendant's claim of negligence, to use the mildest language possible, under the circumstances thus clearly known to Mutual.

Mutual knew or was charged with notice that, when they honored the draft drawn on them and paid Popovic the actual amount loaned of a retail note secured by a mortgage on a retail sale, they were taking a mortgage on property on which they already held a mortgage lien. There is no reason why the wholesale mortgage should not have been credited to protect the rights of the retail mortgagor, even if it were concluded that Mutual and Popovic were not acting as principal and agent as to these sales transactions. Certainly, Mutual should not be permitted to act in its relations with Popovic so that Popovic's pur-

chasers could not (to their knowledge) get title to the automobiles they purchased and paid for. To do so, when fully advised, as it was of the circumstances, constituted fraud in which it took a direct part.

The specific facts as to the purchase of the Chrysler automobile by the defendant, Kozoil, in this action are that he, Kozoil, placed an order with Popovic for a 1959 Chrysler, the down payment of $865 being made December 31, 1958. The automobile assigned to Kozoil was delivered to Popovic, with five other automobiles, on March 25, 1959. The manufacturer's statement of origin made out to N. J. Popovic, Inc., was dated March 25, 1959. It was attached to the draft drawn on Mutual by Chrysler Corporation as per the agreement between Chrysler, Mutual and Popovic. The defendant, Kozoil, paid the balance due of $2,460.60 in cash and turned in a 1951 Chrysler for a credit of $201.48. These payments were made on March 27, 1959. The automobile was delivered to Kozoil on March 28, 1959. Chrysler drew on Mutual by draft dated March 30th for $3,097.80 in payment for Chrysler M 511-112066 (the automobile delivered to Kozoil), which was paid on that day by Mutual, the manufacturer's statement of origin having been received by Mutual at the time of such payment. It has been in Mutual's possession since that day. The floor-plan or wholesale mortgage from Popovic to Mutual covering the six Chryslers (one of which was M 511-112066 delivered to Kozoil) was dated March 30, 1959, and contained, in part, the following provisions:

"That said mortgagor shall retain possession of said chattels during the existence of this mortgage and shall not use the same in any way except to display them in his sales room at city of Cleveland, state of Ohio; that the said mortgagor may sell each of said chattels in the regular course of his retail trade at his usual retail price for cash or upon such terms and conditions as the mortgagee may approve in writing; that in the event the mortgagor so sells any one or more of such chattels the proceeds of each such sale, and the evidence thereof in whatever form the same may be shall be the property of the mortgagee and shall be held in trust by the mortgagor for the use and benefit of the mortgagee and the mortgagor agrees as such trustee to deliver such proceeds and such evidence of sale immedi-

ately upon his receipt thereof to the mortgagee to be applied by it toward the reduction of the indebtedness secured by this mortgage.''

From the foregoing facts, aided by the provisions of the mortgage, the conclusion is inescapable that Popovic was acting as the agent of Mutual in making this sale and collecting the money paid. Popovic did not hold the certificate of title to the motor vehicles to be sold. Section 4505.04, Revised Code, in part, provides: ''* * * nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title, or manufacturer's or importer's certificate for said motor vehicle, for a valuable consideration.'' Mutual never permitted the manufacturer's statement of origin, admittedly held by it ''for a valuable consideration'' (a floor-plan mortgage) to get out of its possession. Certainly Popovic could make no claim for possession of such statement under his agreement with Mutual so that since possession of an automobile gives no indication of the right to sell a motor vehicle under the title law, his only right to sell the automobiles put on his floor by Mutual must have been with Mutual's express consent. This was the purpose of the provisions of the mortgage, above quoted, when considered by the other admitted facts of Mutual's control over Popovic. As above set out, Mutual was fully advised about and consented to such sales. They were, in fact, sales made by its acting sales representative.

The issue to be decided here is not concerned with the certificate of title law. The question to be decided is whether Mutual was, in fact, a party to the sale. When Mutual made an automobile available for sale to one he knew was ''out of trust,'' knowing that such seller was powerless to furnish a certificate of title because Mutual, its principal, was holding the certificate of origin for its security, and a sale was made within the terms of the agent's authority, and the money was paid, which under the terms of the mortgage the agent was obligated to hold in trust for Mutual, Mutual owes the legal duty to confer title on the purchaser of such sale upon the payment of the purchase price. We think that the record clearly requires this result.

The claim that the buyer must accept full responsibility under the title law by asking to see such title document before

paying his money is without legal foundation upon the facts in this case. The title law was passed for the purpose of preventing fraud and deception in passing title to automobiles, not to encourage it. The purchaser, as well as the lending agency, is entitled to its benefits. Where a lending agency has full knowledge of the continued defaults of an automobile dealer with which it is associated, that is, that he is using cash received in the most recent sales to pay off floor-plan liens held by such lending agency in earlier sales transactions or where the facts are such as are so obvious that knowledge thereof must be implied, the lending agency cannot shut its eyes to reality and attempt to avoid responsibility by claiming rights or immunity under the title law. The principle involved is the same as applied in the case of *Davis* v. *Commercial Credit Corp.*, 87 Ohio App., 311, 94 N. E. (2d), 710. That action was one for damages against a construction company and the finance company that financed the construction company's operations in applying asbestos siding to the outside walls of old houses. The construction company was said to be a cheat, doing poor work and guilty of fraudulent conduct in getting contracts, all to the knowledge of the lending institution, which, with such knowledge, financed the construction company's operations. The defense was that they were holders in due course of a note signed by the plaintiff in payment for the work done. There was no question in this case but that Commercial Credit knew of the fraudulent conduct of the construction company. The court held:

"A finance company had prepared and delivered to a contractor engaged in procuring contracts for, and placing of, residing on the outer walls of dwelling houses, notes carrying a printed form of assignment to the company. Its practice was to take an assignment of the note immediately upon the procuring of the contract by the contractor. The latter was engaged in doing inferior work and was guilty of fraud in his operations, which facts had been brought to the attention of responsible officers of the finance company. *Held*: In an action by the maker of the note, who had paid the same, against the contractor and the finance company to recover the amount paid, on the ground of conspiracy between the contractor and

the company to defraud, upon adequate proof of such ground a verdict and judgment on behalf of the property owner will be sustained.''

And on page 318, the court quoted from the first paragraph of the headnotes of 128 A. L. R., 726, which is a report of the case of *Commercial Credit Co.* v. *Childs*, 199 Ark., 1073, 137 S. W. (2d), 260, as follows:

''1. A finance company which had prepared and delivered to an automobile dealer forms of notes and conditional sales contracts bearing a printed form of assignment to itself, and which, on the day of the sale of a car by the dealer, took an assignment of the sales contract and purchaser's note, is to be regarded as a party to the transaction against whom the defense of fraud and misrepresentation may be made, rather than as an innocent purchaser for value before maturity.''

There can be no doubt but that Popovic, in taking $3,527.08 from Kozoil for the pretended sale of a Chrysler automobile to which it then was unable, to its knowledge, to give good title, and by its conduct clearly showing that it had no intention to use and did not use the money paid to release the title of the Kozoil automobile, committed active fraud, and where Mutual, with full knowledge of these facts, made Popovic's fraudulent conduct possible to its financial advantage, it becomes, under the *Davis case, supra*, a party to such transaction. That the responsible officers of Mutual were fully informed that Popovic was ''out of trust'' for a considerable period of time as to a considerable number of sales prior to the sale of the Chrysler automobile to Kozoil is evidenced by an examination of the balances due on floor-plan mortgages, as shown by the control account card. The average number of new automobiles held under Mutual's floor-plan mortgages during the last few months of the operation of Popovic numbered about forty-six and the number of used motor vehicles so held was about thirty-two (all late models). This represented a total in dollars of all floor-plan mortgages of about one hundred sixty thousand dollars ($160,000). The control account card shows that the highest total balance of floor-plan mortgages during the period from December 8, 1958, to March 15, 1959, was one hundred sixty-four thousand dollars ($164,000) and the lowest balance was

one hundred twenty-eight thousand dollars ($128,000). The record shows that from March 15 to April 8, 1959, Popovic was "out of trust" as to twenty-two to twenty-five automobiles as shown by the car checks, of which fact Mutual had direct knowledge. This would mean a shortage in money not accounted for, as to the cars sold and paid for, of about sixty thousand dollars ($60,000) or an amount equal to thirty-eight per cent (38%) of the running balance of such loans. Yet, with this substantial shortage in money paid by purchasers, the account cards did not show any radical change of the total balance due on such mortgages. This could only be explained by the fact that such money received but not accounted for as to the sales upon which payment was made by the buyer was used to pay prior "out of trust" transactions which must have been of long standing under these circumstances.

The plaintiff was guilty of other conduct, heretofore set out, showing its disregard of the rights of persons dealing ostensibly with Popovic in the purchase of automobiles furnished by Mutual and delivered to Popovic for that purpose. During the last month or two of the operation of Popovic's dealership, Mutual honored and paid ten drafts drawn on it by Popovic amounting to over twenty thousand dollars ($20,000), the amount being paid to Popovic as proceeds on retail mortgages obtained in financing sales of automobiles upon which Mutual was then holding wholesale or floor-plan mortgages. Unless these floor-plan mortgages were liquidated, Mutual would not release, and now refuses to release, the manufacturer's certificate of origin or the certificate of title, which it held as to all ten of these automobiles. In fact, as to these ten automobiles, Mutual is now seeking replevin based on such mortgages and its retention of the title papers. Mutual's conduct, with full knowledge of Popovic's financial distress and that it was "out of trust" on many automobiles, cannot be explained by Mutual by its expressing the hope that Popovic might use the money to pay off Mutual's prior mortgages so that title could be delivered to the purchasers, which, as should have been anticipated by Mutual, Popovic did not do. Such utter disregard for the rights of those with whom Mutual was dealing supports in full their participation in the active fraud of Popovic in the making of the sales transactions here involved.

One other circumstance supports our conclusion that a judgment should be entered against the plaintiff in its replevin action and a decree entered directing the plaintiff to deliver a certificate of title to the 1959 Chrysler automobile sold by Popovic to the defendant Kozoil. Section 4505.13, Revised Code, in part, provides:

"* * * Exposure for sale of any motor vehicle by the owner thereof, with the knowledge or with the knowledge and consent of the holder of any lien, mortgage, or encumbrance thereon, shall not render such lien, mortgage, or encumbrance ineffective as against the creditors of such owner, or against holders of subsequent liens, or mortgages, or encumbrances upon such motor vehicle."

The word "purchaser" was omitted from this part of the section.

It should be noticed, therefore, that this part of the section seems to modify its earlier provisions making it unnecessary to record chattel mortgages or instruments of like character covering motor vehicles. The earlier provisions provide that any mortgage or like instrument covering a motor vehicle, if accompanied by delivery of a manufacturer's certificate, followed by actual and continued possession of such certificate by the holder of such mortgage or instrument, or when the lien is noted on a certificate of title by the clerk of courts, shall be valid as against the creditors of the mortgagor and against subsequent purchasers, mortgagees and other lienholders. (It should be noted here that this defendant [Kozoil] was not a subsequent purchaser. He bought and paid for and was in possession of the automobile two days before the plaintiff's mortgage was executed or before it received possession of the manufacturer's certificate.) The provisions first quoted were placed in the statute after this provision, and, as stated, omitted "purchasers" from the lien of a mortgagee on an automobile exposed for sale with the consent of the mortgagee. Purchasers are, therefore, by the doctrine of exclusion, not subject to the lien of such mortgage. It seems incredible that judicial interpretation of the motor vehicle title law should find within its provisions a legislative purpose to defeat the right of an innocent purchaser for value, when the holder of the mortgage and

the manufacturer's statement or certificate of origin expressly consents to exposing the automobile covered by the mortgage for sale, and actually consents to the sale, making the dealer its representative or trustee for collecting and accounting to it for the proceeds of the sale when both dealer and mortgagee are attempting to accomplish a common purpose.

The conditions of the sale to Kozoil authorized by the mortgagee have been fully performed by the buyer; this plaintiff, having taken part in the common purpose to effect such sale, should be directed to present to this defendant a certificate of title as provided by law.

*Judgment accordingly.*

HURD, P. J., concurs.

KOVACHY, J., dissents for the reasons set forth in the opinion in *Mutual Finance Co.* v. *Municipal Employees Union Local No. 1099*, 110 Ohio App., 341.