402 A.2d 663

The COMMERCIAL NATIONAL BANK OF TIFFIN, OHIO,

v.

REEDMAN CHEVROLET, INC., Appellant.

Superior Court of Pennsylvania.

Argued June 14, 1978.

Decided April 20, 1979.

514

Thomas W. Murrell, III, Philadelphia, for appellant.

Alan J. Dion, Morrisville, for appellee.

Before JACOBS, President Judge, and HOFFMAN, CERCONE, PRICE, VAN der VOORT, SPAETH and HESTER, JJ.

SPAETH, Judge:

This is an appeal from an order entered in an action in replevin brought by the Commercial National Bank of Tiffin, Ohio, to recover ten automobiles, or their value, from Reedman Chevrolet Inc. of Langhorne, Pennsylvania. The automobiles were purchased by Reedman from the Bill Simonis Chevrolet-Buick car dealership of Loudanville, Ohio, and were floor-plan-financed by Commercial and the Farmers Savings Bank of Loudanville. After a hearing, the lower court made findings of fact and held that Commercial was entitled to the value of the automobiles, with interest. The narrative that follows is based on the lower court's findings.

During 1968 and 1969 Reedman purchased between four and six thousand automobiles from other dealers. As part of its effort to locate automobiles, Reedman mailed a form letter from its Langhorne office to various dealers in the eastern part of the United States, informing them of its interest in purchasing available automobiles. One of these letters was sent to Simonis, and on or about November 4, 1968, Simonis called Robert J. Ebert, Reedman's General Sales Manager, and offered to sell Reedman two automobiles. Ebert accepted the offer, and on that same day sent Simonis a certified check in full payment for the two auto-

mobiles. Upon receipt of this check, Simonis sent Reedman a dealer's invoice showing that the cars had been paid for in full by Reedman. Simonis also sent Reedman cards to be sent to the General Motors Corporation upon the resale of the automobiles, and copies of the manufacturer's invoices. These invoices described the automobiles in question as having been sold to Farmers. Reedman dispatched a driver to take possession of the automobiles in Ohio, and in late November 1968 they were delivered to Reedman. Reedman had been doing business with Simonis since 1964 and had purchased automobiles from Simonis on four or five prior occasions. In making these purchases Reedman had checked with General Motors to make sure that Simonis was not in any financial difficulty. On or about July 26, 1969, again as a result of a call by Simonis to Ebert, Reedman purchased eight more automobiles from Simonis.

At no time did Simonis advise Ebert that the ten automobiles thus purchased by Reedman were subject to any financing arrangement or that Simonis planned to use the proceeds out of trust. Reedman never obtained from Simonis, or from any other source, Ohio certificates of title or manufacturer's certificates of origin for the automobiles. Reedman did not need these documents to obtain valid title in Pennsylvania at that time. All ten automobiles were resold by Reedman, and certificates of title were obtained for the purchasers by using the documents that had been forwarded to Reedman by Simonis.

As indicated, the ten automobiles purchased by Reedman from Simonis were in fact floor-plan-financed. Commercial had an agreement with Farmers to finance no more than twelve vehicles in the Simonis inventory. Under this agreement Farmers would obtain from Simonis and send to Commercial an undated note for the price of each automobile, signed by Simonis, and with the note, as collateral, the manufacturer's certificate of origin for each automobile, and also the duplicate manufacturer's invoice. Because of this arrangement first Farmers, and then Commercial, held the note and the certificate of origin for each of the ten automo-

biles purchased by Reedman from Simonis. All ten of the automobiles had been floor-plan-financed by Farmers before Reedman's purchase, and all but four of the automobiles had been delivered to Reedman before Commercial got from Farmers the notes and manufacturer's certificates of origin pertaining to the automobiles.

The following findings of fact by the lower court are pertinent to understanding how Commercial and Farmers did business with Simonis:

20. In bank financing of automobile dealers floor plans, after the dealer's credit has been approved by the financing bank, the dealer then informs the manufacturer of the vehicles he wishes to be financed whereupon the manufacturer forwards to the financing bank, for each vehicle to be financed, the Manufacturer's Statement of Origin (which contains a statement of the name of the manufacturer, a description of the vehicle, the fact of transfer to the dealer, the date of the transfer and the Manufacturer's Invoice number for the vehicle) and the Manufacturer's Invoice for the vehicle . . . . The financing bank then takes a note from the dealer for the price of the vehicle and sends its check for the price to the manufacturer.

\* \* \* \* \* \*

25. It is the custom and usage in the banking and financing trade in Ohio not to transfer possession of a financed motor car from a dealer to a purchaser without the dealer obtaining from the bank the Manufacturer's Statement of Origin. It is also the custom and usage in the financing trade in Ohio for a bank to accept the Manufacturer's Statement of Origin as collateral for a loan.

26. Commercial did not purchase the ten vehicles forming the subject matter of the instant suit for its own use but rather these cars were only collateral for the payment of money advanced by Commercial for Simonis. The relationship between Commercial and Simonis was strictly a financing transaction.

27. Commercial permitted and authorized Simonis to put the ten vehicles in question in his showroom and to sell them; the purpose of Commercial's financing arrangement with Simonis was to permit him to sell the ten vehicles in order to repay Commercial for its loans.

28. To protect its interest, Commercial had Farmers make periodic checks of Simonis' inventory and received no reports from Farmers of Simonis selling vehicles out of trust until Farmers reported that a check made March 30, 1970 showed two vehicles missing from inventory. Commercial did not itself check Simonis' inventory to make sure that the cars remained in the inventory.

29. Commercial's name does not appear on the Manufacturer's Invoices or Manufacturer's Certificates of Origin for any of the vehicles that form the subject matter of this litigation.

30. Commercial filed no financing statements with respect to the ten vehicles in question.

31. Commercial received no reports from Farmers that the ten cars in question were actually in the possession of Simonis at each time Commercial financed the respective cars.

32. Commercial did not make inquiries of Simonis and Farmers as to the physical location of the respective cars at the times it accepted the notes from Simonis.

Findings of Fact 20, 25–32.

At a date not disclosed in the record, Simonis filed a petition in bankruptcy in the United States District Court for the Northern District of Ohio. In March 1970 Commercial received notice of, and participated in, the bankruptcy action, and then for the first time learned that the ten automobiles, for which it still held the manufacturer's certificates of origin, had been purchased by, and delivered to, Reedman. On August 28, 1970, Commercial filed objections to Simonis's discharge in bankruptcy, claiming that Simonis owed it $41,453.44. This amount included the amount due Commercial on the ten automobiles. On October 26, 1970, Commercial withdrew its objections in return for an unse-

cured note from Simonis in the amount of $41,453.44. In the meantime, Commercial had made a formal demand of Reedman for the return of the automobiles or their value. Reedman, having sold the automobiles, refused the demand, and Commercial brought the present action in replevin.[1]

The lower court ruled that Ohio law governs the action, and on the basis of its interpretation of the Ohio Certificate of Motor Vehicle Title Law, Ohio Rev.Code § 4505.01 *et seq.*, held that Reedman had purchased the automobiles subject to Commercial's security interest. The court therefore found in favor of Commercial and against Reedman in the amount of $29,635.85, the amount of the security in the motor vehicles, plus interest in the amount of $13,760.59.

■ Reedman first argues that the lower court erred in ruling that Ohio law governs the action; according to Reedman, Pennsylvania law does. In choosing Ohio rather than Pennsylvania law, the lower court relied on Section 9–103 of the Uniform Commercial Code and the Restatement (Second) of Conflicts of Laws. Reedman has presented no argument that convinces us that the lower court erred.[2]

1. The following is a list of the serial numbers of the automobiles, with the date and amount of financing by Commercial:

| Serial Numbers | Date | Cost of Replacement |
| --- | --- | --- |
| 194379S702958 | December 2, 1968 | $4,939.04 |
| 164379U112508 | June 21, 1969 | 2,770.25 |
| 136379B381955 | December 8, 1969 | 2,947.19 |
| 164399U199970 | December 8, 1969 | 3,218.86 |
| 114279W540605 | September 20, 1969 | 2,367.26 |
| 133699B340179 | July 28, 1969 | 2,257.15 |
| 164469U218338 | December 8, 1969 | 3,579.57 |
| 124379N538529 | February 6, 1969 | 2,661.69 |
| 124379N594236 | June 19, 1969 | 2,609.23 |
| 124379N596223 | April 4, 1969 | 2,685.72 |

2. Section 9–103(3) of the Uniform Commercial Code provides in pertinent part that "[i]f personal property . . . is already subject to a security interest when it is brought into this state, the validity of the security interest in this state is to be determined by the law (including the conflict of laws rules) of the jurisdiction where the property was when the security interest attached." Since here the security interest in the automobiles had attached in Ohio (when Farmers and Commercial got the manufacturer's certificates of origin), before the automobiles were brought into Pennsylvania, Ohio

Reedman next argues that the lower court erred in interpreting Ohio law; according to Reedman, under Ohio law as correctly interpreted, it took the automobiles free and clear of Commercial's security interest.

■ Security interests in automobiles in Ohio are not governed by the Uniform Commercial Code but by the Ohio Certificate of Motor Vehicle Title Law. Section 4505.13 of this law provides:

Sections 1309.01 to 1309.50, inclusive, and section 1701.-66 of the Revised Code, do not permit or require the deposit, filing, or other record of a security interest covering a security interest in a motor vehicle. Any security agreement covering a security interest in a motor vehicle, if such instrument is accompanied by delivery of a manufacturer's or importer's certificate and followed by actual and continued possession of such certificate by the holder of said instrument, or, in the case of a certificate of title, if a notation of such instrument has been made by the clerk of the court of common pleas on the face of such certificate, shall be valid as against the creditors of the debtor, whether armed with process or not, and against subsequent purchasers, secured parties, and other lienholders or claimants. All liens, mortgages, and encumbrances noted upon a certificate of title shall take priority according to the order of time in which the same are noted thereon by the clerk. Exposure for sale of any motor vehicle by the owner thereof, with the knowledge or with the knowledge and consent of the holder of any lien, mortgage, or encumbrance thereon, shall not render such

law governs under section 9–103(3). Reedman's main argument against this conclusion is that the security interest with respect to six of the automobiles had not attached because they were transported to Pennsylvania before Commercial got the manufacturer's certificates of origin from Farmers. This contention is without merit. The security interest of Farmers had attached when it received the certificates of origin from the manufacturer, and continued attached when the certificates were sent to Commercial. Commercial stepped into the shoes of Farmer with respect to the attached security interest; the attachment did not lapse during that period when the certificates were sent from Farmers to Commercial.

lien, mortgage, or encumbrance ineffective as against the creditors of such owner, or against holders of subsequent liens, mortgages, or encumbrances upon such motor vehicle. . . ."

Ohio Rev.Code § 4505.13

■ Since Commercial had "actual and continued possession of" the manufacturer's certificates of origin, its interest in the automobiles was valid against Simonis's creditors, subsequent purchasers, secured parties, and other lienholders. However, since it authorized Simonis to sell the automobiles, its interest was not valid against a subsequent purchaser. In *Mutual Finance Co. v. Kozoil*, 111 Ohio App. 501, 165 N.E.2d 444 (1960), *aff'd*, 172 Ohio 265, 175 N.E.2d 88 (1961), the court held that where the floor plan financer knew of past sales out of trust by the dealer, it was required to deliver a certificate of title to an innocent purchaser of an automobile from the dealer. In so holding the court stated:

It seems incredible that judicial interpretation of the motor vehicle title law should find within its provisions a legislative purpose to defeat the right of an innocent purchaser for value, when the holder of the mortgage and the manufacturer's statement or certificate of origin expressly consents to exposing the automobile covered by the mortgage for sale, and actually consents to the sale, making the dealer its representative or trustee for collecting and accounting to it for the proceeds of the sale when both dealer and mortgagee are attempting to accomplish a common purpose.

"The conditions of the sale to Kozoil authorized by the mortgagee have been fully performed by the buyer; this plaintiff, having taken part in the common purpose to effect such sale, should be directed to present to this defendant a certificate of title as provided by law."

*Id.* at 268, 175 N.E.2d at 90, *quoting,* 111 Ohio App. at 501, 165 N.E.2d at 450. Similarly, in *Levin v. Nielsen*, 37 Ohio App.2d 29, 306 N.E.2d 173 (1973), the court held that where the secured party knew of past sales out of trust, it was required to deliver the means of obtaining title to an innocent purchaser.

Here there is no evidence that Commercial had ever found Simonis out of trust in the past, or even that Simonis had engaged in sales out of trust, but this does not defeat Reedman's position. In *Carnegie Financial Corp. v. Akron Nat. Bk. & Trust Co.*, 49 Ohio App.2d 321, 361 N.E.2d 504 (1976), where there was no evidence of past sales out of trust, the court nevertheless held that since the secured party knew that the dealer was exposing automobiles for sale, its lien was ineffective against innocent purchasers.[3]

■ Read together, *Mutual Finance, Levin*, and *Carnegie* demonstrate that under Ohio law, where the secured party authorizes the sale of the secured inventory, its security interest will not defeat the interest of a subsequent innocent purchaser, regardless of the secured party's lack of knowledge of past sales out of trust. The considerations underlying this principle have been stated as follows:

The Certificate of Title Act was adopted to protect innocent purchasers, and to allow the public to rely on duly issued evidence of title. It was not meant to, and does not prevent a court of equity from ordering that title be transferred *if the holder has bound himself to do so,* directly or through an agent. *Cf.* the facts and limitation in *Kelley Kar Co. v. Finkler* (1951), 155 Ohio St. 541, 99 N.E.2d 665; *Commercial Credit Corp. v. Pottmeyer* (1964), 176 Ohio St. 1, 197 N.E.2d 343, as overruled in part, *Hardware Mut'l Casualty Co. v. Gall* (1968), 15 Ohio St.2d 261, 240 N.E.2d 502.

\* \* \* \* \* \*

**3.** In *Carnegie* the secured party brought suit against the purchasers and the purchasers' mortgagee. The lower court held that the purchasers took the automobiles free from the secured party's interest but that the mortgagee was liable on the lien. The Ohio Court of Appeals held, however, that since the purchasers had cut off the secured party's rights in the collateral, the secured party had no rights against the purchase money mortgagee. The Court further held that the purchase money mortgagee was not a subsequent lienholder within the meaning of the Ohio title laws and that the mortgagee was not required to inspect certificates of origin or title before releasing the purchase funds to the dealer.

A dealer having authority to expose floor-planned cars for sale in the ordinary course of business binds his mortgagee to deliver title to any car so sold, when payment is made to the dealer and whether or not the dealer remits the proceeds to his mortgagee, unless the *buyer* knows or should have known of the financing arrangements, or unless the contract of sale can and does expressly limit the warranty given. *Cf. Fouke v. Commercial Credit Corp.* (Montgomery Co., 1962), 116 Ohio App. 145, 187 N.E.2d 160. As we pointed out in *Mutual Finance Co. v. Kozoil, supra,* 111 Ohio App. 501, 514, 165 N.E.2d 444, R.C. 4505.13 does *not* protect a security interest under the foregoing circumstances.

*Levin v. Nielsen, supra* at 33–34, 306 N.E.2d at 179.

■ Since by its findings of fact the lower court specifically found that Commercial had authorized Simonis to sell automobiles from inventory, Reedman took the automobiles free from Commercial's interest, unless it knew or should have known of the financing arrangements. *See Levin v. Nielsen, supra.* The evidence is clear that Reedman did not in fact know of Commercial's interest. The lower court held that the manufacturer's invoices sent to Reedman by Simonis put Reedman on notice of Farmers' interest and gave it constructive notice of Commercial's interest.[4] While it is true that the invoices described the automobiles as having been sold to Farmers, it must be noted that Reedman did not receive these invoices until after it had agreed with Simonis to purchase the automobiles and had forwarded its check to Simonis in full payment. Thus the sale had been completed when Reedman received the invoices. It is Reedman's knowledge "when the contract [was] made", *Levin v. Nielsen, supra,* 37 Ohio App.2d at 33, 306 N.E.2d at 179, that is

4. The lower court also held that Reedman was bound to know the Ohio law applicable to motor vehicle titles. This truism, however, begs the question of what the Ohio law was. The purchasers in *Carnegie Financial Corp. v. Akron Nat. Bk. & Trust Co.,* and in the other cases cited *supra,* were also bound to know the law of Ohio with respect to title to motor vehicles, but that did not defeat their right to purchase the vehicles free and clear from the floor plan financer's security interest.

decisive, not the knowledge it may have obtained afterwards.[5]

 In permitting Simonis to sell from inventory, Commercial assumed the risk that Simonis would use the proceeds out of trust. Commercial had a duty to check on its investment and to make certain that the automobiles were not being sold out of trust.[6] Reedman's duty as purchaser was to not act in contravention of a security interest of which it had, or should have had, knowledge. It did not need, and it had no duty, to demand or search for the certificates of origin at the time of the purchase, nor did it have a duty to hold back the purchase price until clear title was received. *See Fuqua Homes Inc. v. Evanston Building & Loan Co.*, 52 Ohio App.2d 399, 370 N.E.2d 780 (1977) (bank as purchase money mortgagee although experienced with floor plan financing had no duty to demand or inspect; relies on *Carnegie Financial Corp. v. Akron Nat. Bk. & Trust Co.*).

The decision of the lower court is reversed.

CERCONE, President Judge, concurs in result.

HESTER, J., files a dissenting statement.

JACOBS, former President Judge, and HOFFMAN, J., did not participate in the consideration or decision in this case.

**5.** Apparently the lower court believed that Reedman had a duty after the sale to call the secured party. Certainly if Reedman had demanded a manufacturer's certificate of origin after the sale, Commercial would eventually have been notified of the sale, either when Simonis told it of Reedman's demand or when Reedman brought suit for delivery of the certificates. *See Mutual Finance Co. v. Kozoil, supra; Levin v. Nielsen, supra.* Perhaps if Reedman had brought suit, Commercial could have been warned in sufficient time and could have obtained some or all of the proceeds before Simonis disposed of them out of trust. This is mere conjecture, however. In any case, it is clear that Reedman's duty to Commercial was based on its knowledge as of the time of negotiating the purchase of the automobiles. It had no duty to Commercial after the purchase was completed.

**6.** At no time did Commercial investigate to ascertain the whereabouts of the automobiles it financed with Simonis; in fact, as noted, when Commercial got the manufacturer's certificates of origin for six of the automobiles, they were no longer in the Simonis showroom but in Pennsylvania.

HESTER, Judge, dissenting:

I dissent. I would affirm the adjudication of the court below.