FOUKE ET AL., APPELLEES, *v.* COMMERCIAL CREDIT CORP., APPELLANT.

(No. 2660—Decided July 19, 1962.)

*Messrs. Smith & Schnacke* and *Mr. James T. Lynn, Jr.,* for appellees.

*Messrs. Nieman, Aug, Elder & Jacobs* and *Mr. Winn C. Hamrick,* for appellant.

SHERER, J. This is an appeal on questions of law from a judgment of the Common Pleas Court of Montgomery County, rendered in a declaratory judgment action arising out of the conflicting claims of the parties herein to the right of possession to a 1960 Buick station wagon, serial number 6G 104 6894.

The Common Pleas Court decreed the right of title to and possession thereof to be in the plaintiffs, June Fouke and Arthur E. Fouke, appellees herein, and ordered defendant, Commercial Credit Corporation, appellant herein, to obtain a certificate of title thereto in the names of appellees for said vehicle.

Appellees purchased the vehicle from Ruppert, a Buick dealer in Franklin, Ohio, who displayed it for sale at his place of business in Franklin. Appellees agreed on March 21, 1960, to pay Ruppert therefor $4,745.07, and thereafter, on March 23, 1960, performed their part of the agreement by paying Ruppert

$3,000 in cash and transferring to him a Mercury automobile, for which Ruppert allowed them $1,745.07. On the latter date, Ruppert delivered possession of the automobile to appellees, and they are still in possession thereof. Ruppert agreed to furnish the appellees a certificate of title within ten days, but no such certificate of title has been issued.

Appellant is claiming the right to the possession of this automobile by reason of the fact that it holds a promissory note and purchase money chattel mortgage, executed by Ruppert, for $10,155.86, covering such vehicle and two other vehicles, $3,499.36 of which is assigned to the Buick here in question. Appellant holds the manufacturer's certificate of origin covering the vehicle herein involved.

Appellant had a financing arrangement with Ruppert, under the terms of which Ruppert ordered this automobile from the manufacturer. The automobile was sent to Ruppert by the manufacturer who forwarded through its bank in Detroit a draft on appellant for the cost of the car, a bill of sale, invoice and the manufacturer's certificate of origin. These were sent by the Detroit bank to appellant's bank in Dayton, where the draft was honored and the bill of sale, invoice and manufacturer's certificate of origin were turned over to appellant. By the terms of this financing agreement, Ruppert was to pay his note evidenced by purchase money chattel mortgage and obtain the manufacturer's certificate of origin. By the terms of the purchase money mortgage executed by Ruppert to appellant, Ruppert was authorized to sell this Buick at retail and was required to account for and deliver the proceeds of the sale to appellant and, until such accounting and delivery, Ruppert was to hold the proceeds in trust for appellant, separate and apart from his own funds. This mortgage provided further that in the event Ruppert failed to deliver the proceeds of the sales to appellant, appellant was entitled to take possession of the cars covered by its mortgage.

Appellant has assigned five errors to the judgment, all of which are encompassed in the fifth, which is that "said court erred in that its judgment for the said plaintiff-appellees was against the manifest weight of the evidence and was contrary to law." The fourth error assigned, that "the court erred in admitting testimony and evidence offered by plaintiff-appellees

over the objection of defendant-appellant," has neither been briefed nor argued and will not be considered in this appeal.

Appellant claims the right to possession of the Buick by virtue of its mortgage and Ruppert's breach of the conditions thereof. In support of its claim appellant cites the following sections of the Revised Code, which provide:

*Section 4505.13.* "Sections 1319.01 to 1319.16, inclusive, of the Revised Code, do not permit or require the deposit, filing, or other record of a chattel mortgage, conveyance intended to operate as a mortgage, trust receipt, conditional sales contract, or other similar instrument, or any copy of same, covering a motor vehicle. Any mortgage * * * covering a motor vehicle, if such instrument is accompanied by delivery of a manufacturer's * * * certificate and followed by actual and continued possession of such certificate by the holder of said instrument * * * shall be valid * * * against subsequent purchasers * * *."

*Section 4505.04.* "No person acquiring a motor vehicle from the owner thereof, whether such owner is a manufacturer, importer, dealer, or otherwise, shall acquire any right, title, claim, or interest in or to said motor vehicle until such person has had issued to him a certificate of title to said motor vehicle, or delivered to him a manufacturer's or importer's certificate for it; nor shall any waiver or estoppel operate in favor of such person against a person having possession of such certificate of title, or manufacturer's or importer's certificate for said motor vehicle, for a valuable consideration.

"No court in any case at law or in equity shall recognize the right, title, claim, or interest of any person in or to any motor vehicle sold or disposed of, or mortgaged or encumbered, unless evidenced:

"(A) By a certificate of title or a manufacturer's or importer's certificate issued in accordance with Sections 4505.01 to 4505.19, inclusive, of the Revised Code. * * *"

It is the contention of appellees that the facts here establish a joint venture or agency between Ruppert and appellant, whereby Ruppert was acting as agent of appellant in making the sale to appellees, which binds appellant to complete the sale of the disputed Buick by furnishing appellees a certificate of title thereto. In support of their contention, appellees cite *Mutual Finance Co.* v. *Kozoil,* 111 Ohio App., 501, affirmed by the Supreme Court in 172 Ohio St., 265.

In that case, Mutual was seeking, in a replevin action, to recover possession of a Chrysler automobile from Kozoil who purchased it from Popovic, taking possession thereof on March 28, 1959, paying for same in cash and by trading in another automobile. Mutual held the manufacturer's certificate of origin made out in the name of Popovic, having paid the manufacturer by draft on March 30, 1959, and held a floor-plan mortgage thereon executed by or on behalf of Popovic. Popovic did not remit the proceeds of the sale to Kozoil to Mutual, as required by the terms of the floor-plan mortgage, and did not obtain the manufacturer's certificate of origin from Mutual and deliver a certificate of title to Kozoil. The failure to remit such proceeds caused Popovic to be "out of trust" under his agreement with Mutual.

The terms of the floor-plan mortgage were:

"That said mortgagor shall retain possession of said chattels during the existence of this mortgage and shall not use the same in any way except to display them in his sales room at city of Cleveland, state of Ohio; that the said mortgagor may sell each of said chattels in the regular course of his retail trade at his usual retail price for cash or upon such terms and conditions as the mortgagee may approve in writing; that in the event the mortgagtor so sells any one or more of such chattels the proceeds of each such sale, and the evidence thereof in whatever form the same may be shall be the property of the mortgagee and shall be held in trust by the mortgagor for the use and benefit of the mortgagee and the mortgagor agrees as such trustee to deliver such proceeds and such evidence of sale immediately upon his receipt thereof to the mortgagee to be applied by it to the reduction of the indebtedness secured by this mortgage."

Mutual had been the exclusive financial institution furnishing floor-plan financing for Popovic, a dealer since 1951, more than eight years before Popovic sold the automobile to Kozoil. From 1951 to January 17, 1958, Popovic received the certificates of origin for the cars delivered to him and delivered certificates of title to retail purchasers. During this period Popovic became "out of trust" on a number of sales by failing to remit the purchase price to Mutual in payment of its floor-plan mortgage on the cars sold.

On January 17, 1958, because of Popovic's poor financial condition and for the purpose of keeping him in business, Mu-

150

tual made a capital loan to Popovic in the sum of $18,257.95, of which $12,143 was used to pay Mutual for money received by Popovic on cash sales of cars covered by Mutual's floor-plan mortgage which Popovic had failed to remit to Mutual within a reasonable time after the money was received from the retail purchaser. After January 17, 1958, Mutual withheld the manufacturer's certificates of origin from Popovic because of his financial condition. Mutual policed the cars held by Popovic under Mutual's floor-plan mortgages every month, or oftener, by what is called a floor-plan check. When cars for which Mutual had not been paid were missing on such check, some explanation was called for, which was usually that the car had been loaned out or that payment had not yet been received, with no attempt by Mutual to learn the truth. The Court of Appeals said in that case, at page 507:

"* * * The record reads as though Mutual expected Popovic to be 'out of trust,' and as long as they, Mutual, held the titles, their attitude was, as was said during argument in this case, 'let the buyer beware.' "

In October 1958, because of Popovic's unstable financial condition, Popovic put $25,000 cash in the business at the request of the manufacturer and Mutual, and he was permitted to continue in business on a limited scale, dictated to and controlled by Mutual. Popovic continued to be "out of trust" until April 1959, when Mutual ended their business relations with Popovic by taking over his inventory held on floor-plan mortgages and all other property covered by mortgage given to secure the capital loan of January 17, 1958.

In that case, it was shown further that Popovic sold cars at retail which were financed by the purchasers by a mortgage loan made by Mutual to the purchaser and the proceeds paid to Popovic instead of being retained by Mutual to reduce the indebtedness of Popovic to Mutual on its floor-plan mortgage.

The Court of Appeals said, at page 507:

"They (Mutual) held the documents that showed title in Popovic, which they would not release until they were paid their wholesale mortgage liens. They knew Popovic was delivering cars and receiving money for sales under such circumstances that their own conduct would prevent him from the performance of his obligation to furnish a title upon the sale. Mutual

did not seek a certificate of title noting its mortgage lien on the public record (certificate of title) with regard to new automobiles purchased for Popovic and mortgaged to them by their floor-plan mortgages. The public records were completely silent as to plaintiff's claims of either ownership or lien rights on the automobiles they furnished Popovic. They supported Popovic in the conduct of the business and yet, in their own interests, prevented him from delivering titles as provided by law.''

The Court of Appeals said further, at page 510:

''From the foregoing facts, aided by the provisions of the mortgage, the conclusion is inescapable that Popovic was acting as the agent of Mutual in making this sale and collecting the money paid. Popovic did not hold the certificate of title to the motor vehicles to be sold. * * * Certainly Popovic could make no claim for possession of such statement [certificate of origin] under his agreement with Mutual so that since possession of an automobile gives no indication of a right to sell a motor vehicle under the title law, his only right to sell the automobiles put on his floor by Mutual must have been with Mutual's express consent. This was the purpose of the provisions of the mortgage, above quoted, when considered by the other admitted facts of Mutual's control over Popovic. As above set out, Mutual was fully advised about and consented to such sales. They were, in fact, sales made by its acting sales representative.

''* * *

''The claim that the buyer must accept full responsibility under the title law by asking to see such title document before paying his money is without legal foundation upon the facts in this case. The title law was passed for the purpose of preventing fraud and deception in passing titles to automobiles, not to encourage it. The purchaser, as well as the lending agency, is entitled to its benefits. Where a lending agency has full knowledge of the continued defaults of an automobile dealer with which it is associated, that is, that he is using cash received in the most recent sales to pay off floor-plan liens held by such lending agency in earlier sales transactions or where the facts are so obvious that knowledge thereof must be implied, the lending agency cannot shut its eyes to reality and attempt to avoid responsibility by claiming rights or immunity under the title law.''

The court said further, at page 512:

"There can be no doubt but that Popovic, in taking $3527.08 from Kozoil for the pretended sale of a Chrysler automobile to which it was then unable, to its knowledge, to give good title, and by its conduct clearly showing that it had no intention to use and did not use the money paid to release the title of the Kozoil automobile, committed active fraud, and where Mutual, with full knowledge of these facts, made Popovic's fraudulent conduct possible to its financial advantage, it becomes, under the *Davis case, supra* [*Davis* v. *Commercial Credit Corp.*, 87 Ohio App., 311] a party to such transaction."

And, at page 514, the court said:

"* * * It seems incredible that judicial interpretation of the motor vehicle title law should find within its provisions a legislative purpose to defeat the right of an innocent purchaser for value, when the holder of the mortgage and the manufacturer's statement or certificate of origin expressly consents to exposing the automobile covered by the mortgage for sale, and actually consents to the sale, making the dealer its representative or trustee for collecting and accounting to it for the proceeds of the sale when both dealer and mortgagee are attempting to accomplish a common purpose.

"The conditions of the sale to Kozoil authorized by the mortgagee have been fully performed by the buyer; this plaintiff having taken part in the common purpose to effect such sale, should be directed to present to this defendant a certificate of title as provided by law."

The judgment of the Court of Appeals was affirmed by the Supreme Court which adopted the analysis of the case by Judge Skeel in the majority opinion of the Court of Appeals.

Do the facts in the instant case show that Ruppert and appellant were enagaged in a common purpose, the sale of automobiles at retail? Do the facts show that Ruppert was acting as the agent of appellant in making the sale and collecting the money paid? Do the facts show that Ruppert became "out of trust" under his floor-plan mortgage agreement with appellant by using cash received in the most recent sales to pay off floor-plan liens held by appellant in earlier transactions? If so, did appellant have knowledge thereof and thereafter permit Ruppert to continue such fradulent conduct to its financial advan-

tage by making automobiles available to him for sale, knowing that he could not furnish a certificate of title to purchasers because it was holding the certificates of origin for its own security? Were the conditions of the sale to appellees authorized by the mortgagee fully performed by appellees, the buyers?

To state the question more simply, does the evidence here tend to prove facts from which, aided by the provisions of appellant's floor-plan mortgage, the conclusion is inescapable that Ruppert was acting as the agent of appellant in making the sale to appellees and collecting the money paid?

The evidence here tends to establish these facts: Ruppert became a Buick dealer in 1955. He obtained his financing with G.M.A.C. through floor-plan mortgages. G.M.A.C. caught him short seven cars on a floor-plan check and he borrowed $20,000 from a Middletown bank on his signature to pay off G.M.A.C. He pledged his life insurance and signed and delivered to the bank an agreement not to sell cars without their consent to secure his loan. Interstate Securities succeeded G.M.A.C. and furnished Ruppert's financing up until November 10, 1959, when appellant successfully solicited Ruppert's financing. Buick sales were down from the middle of June 1957 on, and Ruppert was always ''out of trust'' in his dealings with both G.M.A.C. and Interstate from that time until he was closed out by appellant in April 1960. At the time he was closed out, Ruppert was ''out of trust'' with appellant for 16 cars in the sum of $50,000.

Prior to entering into their financial dealings with Ruppert, appellant required him to furnish them a financial statement showing his assets and liabilities and to give credit references, including banks, previous finance connections, parts houses, seat-cover houses, etc. Appellant further required monthly financial statements of Ruppert. One of the very first such statements was returned to Ruppert because his accounts payable were too high. He reduced short-term payables by $5,000 and listed this amount as a long-term obligation to his father, although no obligation to his father had been previously listed therein. Ruppert discussed this matter with appellant's Dayton manager, Withrow. This was done to make the statement ''look better.'' This altered financial statement was accepted by appellant without checking. All such statements made by Ruppert were false, all of which could have been discovered by

appellant by auditing his books, which was authorized by the mortgage agreement, but which was never done because to do so "would have been an insult to him."

Among the references and accounts payable listed by Ruppert were the Certified Parts Company, to whom he owed a big bill; the Middletown Journal, to whom he "owed a ton of money"; Chapel Buick; the Linden Seat Cover Company which had sued him for $600 and which was discussed with appellant's local manager, Withrow; and a Middletown bank which had loaned him $20,000 to pay off G.M.A.C. because he was "out of trust" with them. Ruppert was current in his payments on this obligation. Appellant checked with all these references and claimed that they gave Ruppert a high credit rating.

Buick sales began to go down in June 1957, and Ruppert became "out of trust" with appellant on first one car and then gradually became "out of trust" increasingly until April 1960, when he was closed out. Appellant checked Ruppert's inventory twice monthly from November 1959 to March 1960, when they began to check once weekly, and at the end twice weekly. Appellant used two men to make these floor-plan checks, Beckham and Pratt. These men were instructed to check the serial numberts of the cars covered by the mortgage by looking at them, but usually permitted Ruppert to look at the numbers for them. He usually had 20 to 30 new cars on hand and 40 to 50 used cars to be checked. He kept the new cars in three different locations and kept the serial numbers of the cars he had sold without remitting the proceeds to appellant written on the palm of his hand. He and the "checker" would first check the used cars. He would allow the checker to see their serial numbers and there was never a discrepancy there. But he would always read off the serial numbers of the new cars to the "checker," although the "checkers" were specifically instructed to look at the numbers. They would then check the new cars in the showroom and move on to a second location. After they left the showroom his employees, at his request, moved the number of cars he had failed to pay for to the third location. Ruppert would then pretend to read the checker the serial numbers of these cars, but the numbers he gave were the numbers of the cars sold but not paid for. During these checks Ruppert would be eight cars short actually but would deceive the "checker" by reading

numbers off the palm of his hand for all except two or three. He purposely allowed them to catch him short on two or three cars each time. He would tell the "checker" that he had just sold these cars and would give the "checker" his check in payment therefor. On none of these occasions did the "checker" ever check Ruppert's records to see whether he was telling the truth.

In December 1959 Ruppert gave a serial number of one of the missing cars to the "checker" instead of the serial number the car being checked and the "checker" looked at the number himself and said, "Where did you get that number?—that isn't even close." The "checkers" caught Ruppert "short" on a couple of other occasions. In early March 1960 the checkers found Ruppert three cars short and said nothing about it to him. Ruppert gave appellant a check in December 1959 in payment for a car and the check was returned to appellant by Ruppert's bank, marked "uncollected funds." Appellant's Dayton manager, Withrow, held the check until Ruppert made it good. On or about March 1, 1960, Ruppert gave appellant four checks in the total amount of $12,000 which were returned to appellant by Ruppert's bank, marked "insufficient funds." Appellant's Dayton manager, Withrow, called him about them and told him he would hold them until he could cover them. Ruppert later liquidated some used cars, for which he received $9,000 and, after selling the car involved herein to appellees and obtaining $3,000 from them, he took $9,000 in cash to appellant's Dayton office and made three of the checks good. Appellant sent the fourth check through the bank again, and it was cleared. Ruppert also gave appellant several bad checks in February 1960. Although appellant extended credit to Ruppert in the sum of $50,000 by the terms of their agreement, appellant permitted Ruppert to increase his indebtedness to $75,000 in March 1960.

In late March 1960, appellant increased the frequency of their floor-plan checks of Ruppert and he continued to deceive them as usual and when caught short again on April 13, 1960, Ruppert gave another check to appellant without funds to cover. On April 14 appellant moved in on Ruppert and made a thorough check which revealed that he was short 16 cars in the sum of $50,000. Appellant then forced Ruppert to liquidate his entire inventory by returning all new cars to Buick, by selling all

used cars, including appellees' trade-in, to other dealers and by selling all new parts to a dealer. Ruppert tried to have the parts sent back to Buick, where he would obtain full price, but Buick said they would have to notify his creditors first and appellant insisted they be sold to another dealer. The price obtained for them was $1,500 less than could have been realized otherwise. All the cash by the liquidation was taken by appellant and credited to Ruppert's account. Some of the used cars and the parts were not covered by any floor-plan mortgage. Shortly thereafter, appellant requested and obtained the resignation of its Dayton manager, Withrow, and fired the "checkers," Beckham and Pratt.

The floor-plan mortgage agreement between Ruppert and appellant is as follows:

"Purchase Money Chattel Mortgage

"Ruppert Buick Company of Franklin, Ohio, mortgagor, hereinafter called 'dealer,' hereby conveys and mortgages to Commercial Credit Corporation of Dayton, Ohio, hereinafter called 'mortgagee,' the following articles with all attachments and equipment as a component part thereof, hereinafter called 'merchandise,' to secure the payment of a negotiable promissory note in the amount of ten thousand one hundred fifty-five dollars and eighty-six cents ($10,155.86), due on June 1, 1960, this day executed by dealer to mortgagee's order, which note mortgagee accepts as evidence and not as payment of the purchase price of said merchandise:

"1960 Buick four-door sedan, Serial No. 7G 104 5722 amount due, $3321.95

"1960 Buick two-door HT coupe, Serial No. 6G 104 6883 amount due, $3334.55

"1960 Buick four-door Estate wagon, Serial No. 6G 104 6894 amount due, $3499.36

"If dealer pays said note or any renewals or extensions thereof, in accordance with its terms, and promptly performs all obligations hereunder, then this mortgage shall be void; if not, then the same shall remain in full force and effect.

"Dealer warrants that merchandise is free and clear of all liens and incumbrances, and that dealer is the absolute owner of same, with full right and power to mortgage it. Dealer shall not remove merchandise from premises described above, without mortgagee's written consent.

"Dealer shall not lend, rent, mortgage, pledge, encumber, operate, use or demonstrate merchandise, but shall keep it properly housed and free from all claims for taxes, liens or other encumbrances. Dealer shall be responsible for all loss of or damage to merchandise. Dealer may sell merchandise at retail, in its regular course of business, for not less than the respective mortgage debts mentioned above. However, upon any sale by dealer, dealer shall forthwith account for and deliver the proceeds thereof to mortgagee, for application upon the mortgage debt in respect to merchandise so sold, and, until such accounting and delivery, dealer shall hold the entire proceeds, in form as received in trust for mortgagee, separate and apart from dealer's own funds.

"Should dealer breach any of the terms hereof, or of any other agreement with mortgagee, or fail to pay said promissory note or any renewals or extensions thereof when due, or should any petition under the Bankruptcy Act or for any amendment thereof, or for the appointment of a receiver, be filed by or against said dealer, or should any execution, attachment or other writ be levied upon merchandise or any of dealer's property, or should mortgagee deem itself or merchandise insecure, note shall become immediately due and payable, at mortgagee's option, and mortgagee may enter any premises and take possession of any or all of said merchandise, without notice or demand, and without legal process, and sell the same at public or private sale, without notice, at which sale mortgagee may be the purchaser. The proceeds, less costs, expenses and attorney's reasonable fees, shall be applied to the payment of the aggregate of the mortgage debts. Any surplus shall be paid to dealer, and dealer shall forthwith pay mortgagee any deficiency.

"At mortgagee's option, and at dealer's expense, mortgagee may insure merchandise, for mortgagee's benefit, against the hazards of fire and theft, for the amounts unpaid to mortgagee hereunder. Mortgagee at any time may examine merchandise, and all books and records of dealer in respect thereto.

"The term 'mortgagee' shall include mortgagee and its assigns. Dealer shall not be or act as the agent of mortgagee for any purpose whatsoever. Waiver of any default shall not operate as a waiver of subsequent defaults. No waiver, modification or variation hereof shall be binding, unless in writing, signed by

mortgagee. Waiver of any breach or default and any prior transaction or hereunder shall not operate as a waiver of subsequent breaches or default hereunder, but all rights hereunder shall continue nothwithstanding any one or more waivers in any prior transactions or hereunder. Time is of the essence hereof. Dealer acknowledges the receipt of a correct copy of this chattel mortgage, as executed.

"[Signed]

"March 2, 1960"

By the terms of the agreement of the appellant and Ruppert, Ruppert authorized any officer or employee of appellant, on his behalf, to execute and deliver wholesale title retention or lien instruments, promissory notes, statements of trust receipt and chattel mortgage financing and other documents, in favor of appellant, in connection with advances in respect to chattels to, or on account of, Ruppert by appellant, and generally to perform all acts and do all things necessary and proper in discharge of the power conferred (including, but not limited to, the fixing of interest rates). Pursuant to this agreement, and from the inception of their relationship on November 10, 1959, appellant exercised such powers, executing notes and chattel mortgages on behalf of Ruppert, and came into possession of all manufacturer's certificates of origin covering all cars delivered to Ruppert by the manufacturer, including the car sold by him to appellees, such certificates being in Ruppert's name. Appellant did not require very strong financial dealers to turn over the manufacturer's certificates of origin to it and did not require all dealers to whom $50,000 credit was extended to do so.

It is in evidence that Ruppert, by an appropriate document delivered to Buick, designated appellant his wholesale clearing agent. Appellant's division manager in Cincinnati testified that under purchase clearance they could buy cars in Cincinnati or from the factory direct. He further said, "I have a sort of a feeling of ownership, we hold the manufacturer's certificate of origin, I always speak of them as mine until they are paid for." The mortgage agreement recites that the note executed by appellant on Ruppert's behalf is accepted by appellant "as evidence and not as payment of the purchase price." Ruppert was not entitled to receive the manufacturer's certificate of origin until he paid for the car. He did not hold it at the time of the

sale here to appellees. He had previously assigned it to appellant. Appellees' petition alleges that Ruppert held title to the car here in question. Appellant's answer specifically denies that Ruppert held title at any time. Appellees' petition alleges that Ruppert did not assign the manufacturer's certificate of origin to appellant. Appellant's answer likewise specifically denies this allegation.

We note that by the terms of the mortgage Ruppert could not lend, rent, operate, use or demonstrate the cars covered by the mortgage and could not remove same from his place of business without the written consent of appellant. The agreement provides, however, that Ruppert could sell at retail for not less than the mortgage debt assigned thereto in the mortgage and that, in the event of such sale, he should forthwith account for and deliver the proceeds thereof to appellant and that, until such accounting and delivery, Ruppert should hold the entire proceeds in trust for appellant.

Upon the facts here, aided by the provisions of the mortgage, we conclude that Ruppert sold the automobile to appellees as an agent of appellant. It would appear that counsel for appellant agrees, because in the record, when he was cross-examining Ruppert about his testimony that appellant stopped the shipment of cars to him, he asked Ruppert this question: "Is it unusual, Mr. Ruppert, in this business of selling cars for a financial organization to direct the shipper or manufacturer to hold back a shipment of cars to a dealer?" The only reasonable conclusion which can be drawn from the evidence here is that Ruppert and appellant were engaged in a joint venture for the sale of automobiles at retail.

Appellant held the title to the cars by holding the manufacturer's certificates of origin and placed them in the possession of Ruppert for sale to the public. They did not permit a certificate of title to be issued in the name of Ruppert with their lien noted thereon for innocent purchasers to see, which would have warned them to act for their own protection. Appellant knew, or should have known, in December 1959, that Ruppert was guilty of fraud because its employee caught him reading a wrong serial number. Appellant received checks from Ruppert in December 1959 and February 1960 which "bounced," all before the date of appellant's mortgage on appellees' car

on March 2, 1960. Appellant, through its Dayton manager, held bad checks of Ruppert in early March 1960 until he could make them good, which he did, in part, by defrauding appellees. We refer again to the reasoning of the Court of Appeals in the *Kozoil case, supra,* which we adopt as our own, applicable to the facts here, in which the court said, at page 510:

"The issue to be decided here is not concerned with the certificate of title law. The question to be decided is whether Mutual was, in fact, a party to the sale. When Mutual made an automobile available for sale to one he knew was 'out of trust,' knowing that such seller was powerless to furnish a certificate of title because Mutual, its principal, was holding the certificate of origin for its security, and a sale was made within the terms of the agent's authority, and the money was paid, which under the terms of the mortgage the agent was obligated to hold in trust for Mutual, Mutual owes the legal duty to confer title on the purchaser of such sale upon the payment of the purchase price. We think that the record clearly requires this result.

"The claim that the buyer must accept full responsibility under the title law by asking to see such title document before paying his money is without legal foundation upon the facts in this case. The title law was passed for the purpose of preventing fraud and deception in passing title to automobiles, not to encourage it. The purchaser, as well as the lending agency, is entitled to its benefits. Where a lending agency has full knowledge of the continued defaults of an automobile dealer with which it is associated, that is, that he is using cash received in the most recent sales to pay off floor-plan liens held by such lending agency in earlier sales transactions or where the facts are such as are so obvious that knowledge therof must be implied, the lending agency cannot shut its eyes to reality and attempt to avoid responsibility by claiming rights or immunity under the title law."

The facts in this case are such that appellant knew, or should have known, that Ruppert was fraudulently using funds of more recent sales to pay off floor-plan liens held by appellant in earlier sales transactions and thereafter permitted Ruppert to continue a fraudulent course of conduct in disregard of the rights of appellee as an innocent purchaser without knowledge of appellant's lien on the car they purchased.

The conditions of the sale to appellees authorized by the appellant's mortgage have been fully performed by them, and appellant, having taken part in the common purpose to effect such sale, should be directed to furnish appellees a certificate of title as provided by law.

We have fully examined and considered the errors assigned and, finding no error in the record prejudicial to the rights of appellant, the judgment of the Common Pleas Court is affirmed.

*Judgment affirmed.*

CRAWFORD, P. J., and KERNS, J., concur.