LEVIN, APPELLEE, *v.* NIELSEN ET AL., APPELLANTS.

30

(No. 31767—Decided December 27, 1973.)

*Mr. Morton Q. Levin,* for appellee.
*Messrs. Baker, Hostetler & Patterson* and *Mr. Wallace W. Walker, Jr.,* of counsel, for appellants.

SILBERT, J., This is an appeal by defendant T. Stenson White from a decision of the Court of Common Pleas which found against him and two co-defendants, Merrill L. Nielsen and Nielsen Sports Cars, Inc. Plaintiff-appellee, by her complaint, sought an order compelling appellant to deliver title to her to an automobile purchased from Nielsen and Nielsen Sports Cars, or in lieu thereof, restitution of the purchase price and other equitable relief as might be appropriate, and exemplary damages. The court found that title was not transferred, and further determined this to

be the result of fraud and deceit chargeable to all of the defendants. Finding that Mrs. Levin was entitled to have title transferred but that the car had depreciated substantially in value, the court awarded Mrs. Levin (1) $8,893.73 in compensatory damages, (2) $2,500 as punitive damages, plus $1,000 for attorney's fees, and (3) interests and costs.

Appellant presents but two assignments of error: (1) that the judgment is contrary to law, and (2) that it is against the weight of the evidence. The first of these is supported by nine abstract propositions of law, and numerous lines of argument. While we treat all of what we understand to be the essential points of contention, in the interest of brevity we will specifically rule only on the two assignments of error formally presented. In weighing the evidence, we will not detemine the facts *de novo*; we cannot substitute our view of the testimony for that of the trier of fact which has heard the witnesses and observed their demeanor. The second assignment of error must be overruled unless it appears that the evidence was not sufficient to enable reasonable minds to render the judgment entered. *State, ex rel. Squire,* v. *Cleveland* (1948), 150 Ohio St. 303, approved and followed in *Cross* v. *Ledford* (1954), 161 Ohio St. 469; Ohio Const. Art. IV, Sec. 3(B)(3); *Ford* v. *Ford* (Cuyahoga Co., 1954), 69 Ohio Law Abs. 97, 98; *Preston* v. *Bricker* (Columbiana Co., 1959), 85 Ohio Law Abs. 329, 331.

Appellant suggests that this court weigh the evidence bearing in mind that Mrs. Levin failed to call him as a witness. The suggestion is utterly without merit. It was not Mrs. Levin's obligation to make out White's defense. White failed to present any evidence. His testimony could have shed light on the issues presented, and an inference can be drawn from his failure to testify. It is an inference against himself.

Taking the facts as expressly or necessarily found by the trial court, and supported by the evidence, it appears that appellant "floor-planned" cars for Nielsen and Nielsen Sports Cars. That is to say, White financed Neilsen's

new and used car inventory, extending credit on demand cognovit notes under a security agreement between White and Nielsen Sports Cars, and holding the certificates of title or manufacturer's or importer's certificates of origin for the cars financed.[1]

While we agree that "under Ohio law, a secured party is not liable for * * * [a] dealer's contracts, nor is he liable for * * * [a] dealer's torts," without more, he is responsible for his own misconduct, and for the misconduct of his agents or of those he has clothed with apparent authority to act in his behalf. *Miller* v. *Wick Building Co.* (1950), 154 Ohio St. 93. A relationship of principal to agent may arise by express agreement, or by implication or estoppel. In the usual case it arises because it is agreed that the agent will act for the principal, or because the principal has led a third party to reasonably believe such a relationship existed. *Cf. Logsdon* v. *ABCO Const. Co.* (Montgomery Co., 1956), 103 Ohio App. 233; *Columbus Pipe & Equipt. Co.* v. *Ackerson* (Franklin Co., 1953), 72 Ohio Law Abs. 321. But it can arise as well where an agent is shown to have authority because his principal has permitted and approved his prior similar acts, where a third party has relied upon the agent's capacity to do the act, to his detriment, without knowledge of an express limitation restricting the agent's actual authority, or without knowledge of the existence of the agency, which is undisclosed. *Cf., Lapham* v. *Spink* (Cuyahoga Co., 1901), 24 O. C. C. (N. S.) 348.

These rules may be limited in certain of their applications, but they are not abrogated by the Certificate of Title Act, R. C. ch. 4505, nor by R. C. 4505.04, in particular. No court may *recognize* title in anyone save one who holds and proves a duly issued certificate of title, or manufacturer's or importer's certificate of origin. *Mielke* v. *Leeberson* (1948), 150 Ohio St. 528. A certificate of title (or certificate of origin), admissions in the pleadings, or stipu-

---

[1]*Cf.* R. C. 4505.13 as sanctioning the practice, and procedure, generally, as illustrated by the facts in *Mutual Finance Co.* v. *Kozoil* (Cuyahoga Co., 1960), 111 Ohio App. 501, aff'd *per curiam* and adopted in substantial part, 172 Ohio St. 265.

lations are the only admissible evidence of title.[2] *In Re Case* (1954), 161 Ohio St. 288. But these restrictions do not preclude or nullify the effect of a purported warranty or guaranty of title. *Shaw* v. *Wearley Motor Co.* (1962), 173 Ohio St. 185. We are not obliged to conclude, *ipso facto*, that no one else is entitled to have title transferred to himself, or that the General Assembly meant to require that automobile purchasers rely solely on a dealer's moral commitment to complete his part of the bargain. The Certificate of Title Act was adopted to protect innocent purchasers, and to allow the public to rely on duly issued evidence of title. It was not meant to, and does not prevent a court of equity from ordering that title be transferred *if the holder has bound himself to do so,* directly or through an agent. *Cf.* the facts and limitation in *Kelley Kar Co.* v. *Finkler* (1951), 155 Ohio St. 541; *Commercial Credit Corp.* v. *Pottmeyer* (1964), 176 Ohio St. 1, as overruled in part, *Hardware Mut'l. Casualty Co.* v. *Gall* (1968), 15 Ohio St. 2d 261.

Within the limitation found in R. C. 1302.02 (compare, *e. g.*, R. C. 1302.42),[3] the provisions of the sales of goods chapter of the Uniform Commercial Code (R. C. ch. 1302) are applicable to the sale of a motor vehicle, and a seller warrants that he will convey good title free from any security interest or other lien or encumbrance of which the buyer is without knowledge when the contract of sale is made.

---

[2]Correspondingly the Act gives a certificate of title a quality of uniqueness; it cannot be argued, as appellant seems to think. that equity will not intervene unless it is further shown that the car also is unique.

[3]R. C. 1302.02 provides, in material part, that

"*Unless the context otherwise requires,* Sections 1302.01 to 1302.98, inclusive, of the Revised Code, apply to transactions in goods; * * * [these provisions do not] impair or repeal any statute regulating sales to consumers, farmers, *or other specified classes of buyers.*" (Emphasis added.)

R. C. 1302.42 prescribes rules governing the passing of title (and the effect of a retention of title by the seller as reserving a security interest), provisions largely inconsistent with the provisions of the Certificate of Title Act, and therefore inapplicable to the sale of a motor vehicle.

34

R. C. 1302.25(A); *cf.,* again, *Shaw* v *Wearley Motor Co., supra.* Absent express contractual language, or circumstances under which the buyer knows or should have known that only a limited warranty was intended (but only to the extent that such a warranty can be limited *see* R. C. 4505.-03 and R. C. 4505.04)), a floor-planner is bound by the warranty given, having clothed the dealer with the apparent capacity to sell the car and warrant title to it. R. C. 1302.25 (B).

A dealer having authority to expose floor-planned cars for sale in the ordinary course of business binds his mortgagee to deliver title to any car so sold, when payment is made to the dealer and whether or not the dealer remits the proceeds to his mortgagee, unless the *buyer* knows or should have known of the financing arrangements, or unless the contract of sale can and does expressly limit the warranty given. *Cf. Fouke* v. *Commercial Credit Corp.* (Montgomery Co., 1962), 116 Ohio App. 145. As we pointed out in *Mutual Finance Co.* v. *Kozoil, supra* (111 Ohio App. 501), 514, R. C. 4505.13 does *not* protect a security interest under the foregoing circumstances. Rather, and to this extent, the so-called "floor-plan doctrine" survived enactment of the Certificate of Title Act. Contrast *Mutual Finance Co.* v. *Municipal Employees Union* (Cuyahoga Co., 1960), 110 Ohio App. 341, opinion of Kovachy, J., in which Skeel and Hurd, JJ., refused to join; *Mutual Finance Co.* v. *Kozoil, supra,* 515, dissenting opinion of Kovachy, J. See, *National Guarantee & Finance Co.* v. *Pfaff Motor Car Co.* (1931), 124 Ohio St. 34.

As shown by the evidence, on or about August 12, 1970, Mrs. Levin approached Nielsen about buying a new car to replace a 1967 B. M. W. which she had also purchased from him, but which was no longer suitable for her needs. He showed her a 1970 B. M. W., and she was permitted to take it off the lot, and take it home, to try it out. She testified that as far as she was concerned, she was buying it. She left the 1967 B. M. W. as security, or as a down payment against the purchase price on the 1970 car. Price was discussed, but no final figure was reached, largely because it was

understood that the final purchase price would have to depend upon what Nielsen could get for the trade-in. Mrs. Levin wanted $5,000, but authorized Nielsen to sell it for the best price he could get. The evidence discloses that he sold it within a week, taking $50 in cash and a check for $4,134.10 (which he cashed).

Mrs. Levin again met with Nielsen one or more times between the 8th and 10th of September, 1970. He told her that he had sold the car, or that he had found a buyer. He told her that the buyer wanted a 90-day or 4,000 mile warranty, and that he was going to put the car in suitable condition. Purchase price for the 1970 car was discussed. A work sheet dated September 9, 1970, indicates a total price of $9,503.30 (including a reduction of $635.50 off list price plus extras), less an allowance of $4,000 on the trade-in[4] Although a contract of sale was not signed, both Mrs. Levin and Nielsen considered the sale certain. Mrs. Levin gave Nielsen her check for $2,394.50, as additional deposit. Title to the trade-in was endorsed September 10, 1970.

A contract of sale was not signed until October 24th.[5] List price was recalculated at $10,354.27. Mrs. Levin was allowed $7,855.04[6] in credits—$2,394.50 (paid by her check of September 9, 1970) plus $5,460.54, denoted "UC Allow." This $5,460.54 figure includes a credit of $4,000 on the trade-in and an additional allowance of $1,460.54, the total credit necessary to justify the final totals shown on a memorandum dated October 26th.[7]

---

[4]The $9,503.30 figure is not a correct sum of the figures upon which it is supposedly based. Nor, apparently, was the correct amount of tax charged. The intermediate "net" figure of $9,020.80—ostensibly the $9,503.30 figure excluding freight, dealer handling and registration costs and tax—is not a correct sum of the figures it purports to be the sum of, but it is the correct difference of the August figure, $9,656.30, less the $635.50 Nielsen was offering as an allowance against list price.

[5]It may have been signed on the 26th and back-dated. Credit is given for a check (of $499.23) dated and certified on the 26th, and the final cost figures are explained in a signed memorandum bearing that date.

[6]The figure shown is $7,395.47, which, however, is erroneous although the final figures are correct.

[7]See fn. 5. By comparison with the September 9th and August

Thus it was agreed that the final purchase price would be $8,893.73.[8] Credit was given for Mrs. Levin's $499.23 check (dated October 26th), leaving a net balance due of $2,000. And on or about November 3rd appellant delivered her third and last check (for $2,000) to Nielsen, covering the balance due, and marked "In full, B. M. W. C. S. Coupe." This check (but not the previous two) was endorsed to "T. S. White" and was cashed by his office. An entry was made on White's books crediting appellee with this $2,000 payment.

But Mrs. Levin was not given title to the car. Mere possession of an automobile carries no implication of any right in it. *Veltri* v. *Cleveland* (1957), 167 Ohio St. 90; *cf.*, *Brewer* v. *DeCant* (1958), 167 Ohio St. 411. During the first part of December, she returned the car to Nielsen's lot, because, as she testified, she could not register, or insure it. Nor could she lawfully drive it. The car remained on Nielsen's lot until White removed it, then taking repossession title in his own name.

Mrs. Levin did not then know the nature of Nielsen's relationship with White, or that White had told Nielsen to return the car to the floor-plan because Nielsen had attempted to cover his remaining indebtedness with a bad check. *But* White knew about Mrs. Levin. By happenstance he had learned in mid-September that the 1970 B. M. W. was off the lot. White himself talked to Nielsen. By October 27th he knew that the B. M. W. had been sold, that it had been sold to Mrs. Levin, and that over $6,000 had not been re-

worksheets, it is clear that by October Nielsen had forgotten what his prior figures represented. He again subtracted $635.50 (the original credit) from the $9,020.80 intermediate "net" figure (which already reflected the deduction of that same credit from the original $9,656.30 figure), and he used the resulting difference, $8,385.30, to negotiate the final (and even lower) net intermediate price exclusive of freight, dealer handling, and registration costs and tax, specifically, $8,274.80.

[8]The figure can be calculated in three ways: (1) $10,354.27 list price minus $7,855.04 in credits, plus $2,394.50 (check of September 9, 1970) plus $4,000 (credit on trade-in); /(2) $10,354.27 list price minus $1,-460.54; /(3) $8,274.80 plus $73.16 (for freight) plus $100 (dealer handling) plus $437.17 (taxes) plus $8.60 ("T. Plates").

mitted, contrary to the security agreement and in total disregard of various financial procedures White had been trying to force Nielsen to adopt.[9]

To establish that White may be called to answer in punitive damages it is necessary to show more than that he was under a duty to release title. A false apprehension of the law is not sufficient, but it must appear that his own conduct was fraudulent, or willful, or the result of actual malice, or that he authorized, ratified, or participated in his agent's misconduct, or failed to exercise reasonable care in entrusting an agent to act on his behalf, or in allowing him to continue doing so, and that the agent's conduct was fraudulent, or willful, or resulted from actual malice, as appellant should reasonably have foreseen it might have been. *Columbus Ry., P. & L. Co.* v. *Harrison* (1924), 109 Ohio St. 526; *Tracy* v. *Athens & P. C. & L. Co.* (1926), 115 Ohio St. 298, 302-303; *Saberton* v. *Greenwald* (1946), 146 Ohio St. 414; *Smithhisler* v. *Dutter* (1952), 157 Ohio St. 454; *cf. Bush* v. *Kelley's, Inc.* (1969), 18 Ohio St. 2d 89; *Cleveland Ry. Co.* v. *Wiesenberger* (Cuyahoga Co., 1922), 15 Ohio App. 437; *Cleveland Ry. Co.* v. *Lesko* (Cuyahoga Co., 1931), 39 Ohio App. 339.[10]

White commenced floor-planning for Nielsen in August, 1968. He continued to do so until Nielsen Sports Cars ceased doing business in April, 1971. In 1970, from January through March, he served as Chairman of the Board of

---

[9] Actually Mrs. Levin had then paid $6,893.73. According to White's books, the total loan on the car amounted to $7,974.80.

[10] In this regard, there is good authority that punitive damages may be assessed in a case based on allegedly fraudulent and deceitful misconduct, notwithstanding that the action may be *ex contractu*, warranty and fraudulent misrepresentation being grounds originally viewed as sounding in tort. *Craig* v. *Spitzer Motors* (Franklin Co., 1959), 109 Ohio App. 376, 379-380, opinion by Skeel, J., of the Eighth Appellate District sitting by designation. Appellee's claim sounds in tort, as well as in contract. Our rules of procedure do not require that she elect between alternative, or even inconsistent theories, instead permitting liberal joinder. Civil Rule 8(A) and (E), and Rule 18. *Cf.*, also, *Saberton* v. *Greenwald*, *supra*; R. C. 1301.03; R. C. 1301.06; and R. C. 1302.95.

Nielsen Sports Cars, and during that period he retained the consulting services of HAW Corp., a company largely owned by himself. HAW Corp. was directed to make a study of Neilsen Sports Cars, and of Nielsen's corporate practices, and to make recommendations, which it did. It found that Nielsen was not well suited to run an automobile dealership and recommended that that part of the company's operations be phased out, allowing Nielsen to concentrate his full energies in developing a service oriented business. Nielsen had spent most of his career as an automobile company service manager. He wanted to sell cars. White advised Nielsen to concentrate on service, but White disregarded his own sound advice, cast prudence to the winds, used his personal loan to pay Nielsen's debts, and agreed to finance the purchase of *additional* new car inventory, including the car involved here.

Under Nielsen's security agreement with White, Neilsen could not remove cars from his lot without express written permission. He was permitted to expose the cars for sale, but not sell them without *first* strictly accounting for all money received. White retained the right to enter upon the premises at any reasonable time to inspect the collateral, or Nielsen's books and records.

In the opinion of White's office manager, Nielsen was completely incapable of handling financial matters. He apparently did not keep good books, and his checks were sometimes returned for lack of sufficient funds. During the spring of 1970, White's office instructed Nielsen that payment was not to be made on his personal or company checks. Customer's checks were to be turned over to the bookkeeper, who was directed to follow stated precedures and to deposit such funds directly into White's accounts (using deposit slips supplied by White). The bookkeeper alone was to be authorized to write checks to cover any deficiency resulting from credit given on a trade-in, or to request title when payment was made. White's personnel believed that these procedures would spare them any involvement in Nielsen's affairs. The procedures were not strictly followed.

Nor was the security agreement strictly enforced. Per-

haps as Nielsen testified he would not have been able to sell cars had it been. But White knew Nielsen was not complying with the agreement.

White knew Nielsen had in the past sold cars without turning over the proceeds received. He knew Nielsen had at times been "out-of-trust" on as many as five or six vehicles. He knew or should have realized that Nielsen had corrected this situation only as it was called to his attention—only when caught short.

White's only concern was that he was paid, that the checks he received cleared. Until the end, he allowed Nielsen to hold title to two cars without first receiving payment. He did not keep an accurate check on his security. So long as Nielsen assured him that a particular car was in the hands of a prospective purchaser, he did not apparently care whether the car was removed.

It is difficult to imagine a combination of practices fraught with greater hazard to the unsuspecting buyer. Given White's knowledge of Nielsen's precarious financial condition (and not withstanding anything Nielsen may actually have been told), White's acts (especially, omissions) can only be construed and should have been foreseen as effectively encouraging Nielsen to sell now, pay later—to sell a car one week in the hope that another car could be then sold to cover the indebtedness on the car sold first.

But that is not the full extent of White's involvement. By the fall of 1970, he was demanding that Nielsen furnish financial statements. Nielsen did not do so. White did not himself examine Nielsen's books. Nor did he then terminate the mortgage agreements, demand payment, and attempt to recover "his" collateral. Instead, he told Nielsen that his checks *would not be accepted unless first certified.*

The money Mrs. Levin paid by September 10th, plus the trade-in, represented nearly three-quarters of the final purchase price. White's books indicate that during the period from mid-October through mid-December—in what was apparently Nielsen's last surge of sales activity—Nielsen was trying to sell and have title released on at least six cars. Nielsen was unable to promptly cover his indebted-

ness on five of the six. The indebtedness on the 1970 B. M. W. was considerably larger than that outstanding on any of the others. Title was eventually released on all but Mrs. Levin's car, but only after the indebtedness on two of the cars was covered by misappropriating Mrs. Levin's final $2,000 payment, and after at least two of Nielsen's own checks failed to clear.

That Nielsen acted with actual and constructive fraud and deceit is beyond cavil. He held himself out as having power to sell the car with complete disregard for the truth, or with actual knowledge that he could not. He failed to disclose the nature of his relationship with White, even while knowing that he was converting appellee's payments to his own use, and had converted funds received for the trade-in. He told Mrs. Levin that he could only return her money by reselling the car, thus inducing her to leave it on his lot for that purpose, without telling her that White had told him to have the car returned, and knowing that he could not sell the car—that he could only deliver title to a buyer by paying White, not Mrs. Levin.

Moreover, it was he who told White to credit Mrs. Levin's final $2,000 payment to clear title to the two other cars mentioned earlier. White did so.

White cannot ensconce himself behind a claim that he was only following Nielsen's instructions. He knew too much about Nielsen's business practices and financial condition. He made himself a party to the deliberate misappropriation of Mrs. Levin's money without the slightest concern as to whether Nielsen had or had not returned what he knew Mrs. Levin had paid. As far as he was concerned (and he still maintains) he had only to deal with Nielsen, "let the buyer be damned." He put the car in Nielsen's hands, kept Nielsen in business, and relied wholly on what Nielsen told him even when his own knowledge and experience, much less ordinary prudence, should have told him that Nielsen was financially inept, less than candid, and prone to play fast and loose with other people's money when short himslf.

We fully understand that a variety of factors may en-

courage a lender to keep a dealer financially afloat if and as long as possible. Where unsecured loans have been made, the temptation may prove too strong to resist. But that business decision carries its price.

White's negligence, indeed direct participation, overt cooperation and acquiescence, allowed Nielsen to do what was done. White is no remote holder in due course, but directly responsible and party to Nielsen's misconduct.

Mrs. Levin was maneuvered into a position in which she is expected to bear the brunt of Nielsen's subsequent financial collapse, all of which is fine with White so long as he gets "his" money. He has the audacity to suggest that "a basic question in this case is whether or not * * * [he] can be made to pay twice for an automobile which he has financed." In the narrow sense, the question is whether he could honestly have believed that he had a right to expect Mrs. Levin would or could be required to pay *him* twice, when he knew that he held funds paid by her, and allowed and participated in their misappropriation. More broadly the issue is whether or not he is to be called to account for the results of his totally wanton and callous disregard for the rights of anyone but himself, and of Mrs. Levin, in particular.

By devious paths he seeks to escape. He argues that execution of the contract of sale must have been delayed because appellee agreed to absorb any warranty claim which might have been made against the trade-in, that a final price could not be determined until the warranty had run. As the argument goes, title was not transferred by mid-December because he did not then have the certificate of origin in his possession, having returned it to the importer for what is known in the trade as "updating." Mrs. Levin returned the car to Nielsen's lot before title was returned, supposedly rescinding the contract and relieving appellant of any further obligation.

To the extent this argument was actually presented below, the trial court found otherwise. However, this hypothetical chain of events is largely a product of appellant's imagination. The contract of sale was signed well before

the warranty period would have run, and there is no evidence that Nielsen then knew that the 4,000 mile limitation had been exceeded. Mrs. Levin testified that she did not know why a contract was not signed earlier. Nielsen was evasive, but it is plain that he told Mrs. Levin he was putting the trade-in in condition to warrant it—implying that he was to assume the risk, the cost being included as part of the package price. (*Cf.* the Sept. 9, 1970, work sheet written in Nielsen's handwriting.)

Up-dating is a procedure followed with regard to some imported cars if the model year changes before the car is sold. If the model has not changed, the importer issues a new certificate of origin under the later date. Nielsen testified that title would normally be up-dated in the ordinary course of business, when the model year changed. The process usually took a week to ten days. Here it took two months from the time White knew a contract of sale was signed (four months from the time he first knew the car was off the lot and presumably in the hands of a prospective buyer). White was able to get the new certificate immediately when he decided *he* wanted it.

Nor is title the central issue. By the time the contract was signed, Mrs. Levin had held the car three months thinking that she had agreed to buy it, and that title would be delivered when payment was complete. She told Nielsen she wanted title, up-dated or not. It was he who *insisted* that it be up-dated. When she returned in December, he told her it had not been returned. She thought he was making another excuse, that he was stalling, and that he would not give title to her. Nielsen by then knew that White wanted the car back. White had no intention of delivering title, and would not have delivered it had he had it. Nielsen could not and would not give Mrs. Levin reasonable assurance that title would be forthcoming. Understandably unhappy with the situation, she told Nielsen she wanted her money back. He told her he did not have it, that the only thing he could do would be to try to sell the car for her, and pay her what he could get. She agreed.

Assuming the relevance of the rescission argument (but *cf.*, R. C. 1302.95), the facts clearly do not warrant

finding more than an agreement (induced by fraud) to rescind upon a condition precedent—any rescission was contingent upon Nielsen then being in a position to make Mrs. Levin substantially whole, a condition which did not occur, and could not have occurred so long as Nielsen could not and White would not deliver title to a subsequent purchaser. Moreover, at all times after the car was returned, Nielsen treated Mrs. Levin as the owner. At Mrs. Levin's counsel's insistence, he wrote Mrs. Levin expressly acknowledging that he held the car for her. He did not tell her that she could not remove it when on several occasions she threatened to do so. He persuaded her to leave it by telling her that he was expecting one or another of several potential buyers who had expressed an interest in looking at it.

It is likewise specious to argue that Mrs. Levin was under a duty to demand title from White. At the outset, she had no knowledge of the true relationship between White and Nielsen—specifically, she did not know White held title. Thereafter, demand would have been futile.

Nor is that all. As a general rule, at law, a person aggrieved by the failure of another to perform a statutory duty imposed for the benefit of the public, or for the benefit of individuals, can assert a breach of that duty in a civil action if, but only if, he is himself within the class of persons meant to be protected. *Marsh* v. *Koons* (1908), 78 Ohio St. 68; *Variety Iron & Steel Works Co.* v. *Poak* (1914), 89 Ohio St. 297, 303, 307; *Miller* v. *East Ohio Gas Co.* (Cuyahoga Co., 1930), 35 Ohio App. 113; *New York, C. & St. L. R. R. Co.* v. *Lambright* (Seneca Co., 1891), 5 O. C. C. 433; *Zajkowski* v. *American Steel & Wire Co.* (C. C. A. 6, 1918), 258 F. 9.

R. C. 4505.03 provides, in material part, that:

"No person * * * shall sell or otherwise dispose of a motor vehicle without delivering to the purchaser or transferee thereof a certificate of title * * *; nor shall any person * * * purchase or otherwise acquire a motor vehicle without obtaining a certificate of title for it * * *."

This legislation imposes a duty upon a dealer to deliver title to a buyer, a duty imposed for the benefit of the buyer and the general public. It requires that a buyer ob-

44

tain title, a provision meant to protect the public, and subsequent purchasers, not one that inures to the benefit of the dealer, or those in privity with him. That the General Assembly did not mean to create reciprocal duties is apparent from the fact that it itself treated the two situations differently: a buyer's failure to obtain title is at most punishable as a misdemeanor; a seller's failure to transfer title can be punished as for a felony. R. C. 4505.18(E), R. C. 4505.19(F), and R. C. 4505.99.[11] In giving effect to the legislature's intent, it will not be supposed that an absurd result was intended, or that a person is required to do an impossible act. Of course, criminal statutes must be strictly construed.

We cannot believe that the General Assembly meant to impose criminal penalties upon an innocent buyer who is prevented from getting title by his dealer's failure to comply with the express mandate of the Certificate of Title Act, and we hold that a buyer in the ordinary course of business is not within the intended purview of R. C. 4505.-03, where he has bought or attempted to buy a car in good faith, without knowledge that the dealer is actually without authority to warrant or deliver title to the automobile supposedly sold, or that others in privy with the dealer would make themselves party to criminal misconduct or refuse to relinquish title so that it may be properly delivered. He may rely upon the dealer's warranty of title, and upon the dealer to deliver title as required by the Certificate of Title Act. He need not look beyond the dealer to demand title from others who by law would be bound to deliver title over, where such persons have actual knowledge or are presumed to share their agent-dealer's knowledge of the sale.

---

[11]Coincidentally, R. C. 4505.18(B) provides that no person shall "Display or display for sale or sell *as a dealer or acting on behalf of a dealer*, a motor vehicle without having obtained a manufacturer's or importer's certificate or certificate of title therefor * * *." (Emphasis added.)

The act of displaying or offering a car for sale when done by one who does not hold title is subject to criminal sanction if, *but only if*, the would be seller is a dealer or is acting on behalf of a dealer. (For the meaning of the term "dealer", compare *Gibson* v. *Bolner* (1956), 165 Ohio St. 357.)

A buyer does not fail to meet his obligations under R. C. 4505.03 if he has possession of the motor vehicle with the consent of the dealer and under the reasonable belief that title is to be or is being tranferred to him, and if, upon learning the contrary to be true, he relinquishes possession to the dealer, or holding naked possession, in good faith seeks timely relief from a court of equity to compel the dealer or others in privity with him to transfer title according to law.[12]

Appellant further asserts that the rule announced in the *Kozoil* case is affected, if not undermined, by the subsequent adoption of Title 9 of the Uniform Commercial Code. *Mutual Finance Co.* v. *Kozoil, supra* (111 Ohio App. 501). We disagree.

For the most part, no conflict can exist between R. C. 4505.13 and those provisions of the U. C. C. dealing with secured transactions. R. C. ch. 1309. A certificate of title or a manufacturer's or importer's certificate of origin is not a "document" within the meaning of R. C. 1301.01(O). A security interest in a motor vehicle can be perfected only by complying with the procedure set forth in R. C. 4505.13. R. C. 1309.21(D); R. C. 1309.21(C)(2).

In adopting the Code, the General Assembly also amended the first paragraph of R. C. 4505.13. It modified the language of the U. C. C. (as drafted by the Nat'l Conf.

---

[12]As to the contention that Mrs. Levin conspired with Nielsen to resell the car, assuming *arguendo* that a resale by Nielsen would have amounted to a sale by Mrs. Levin (a claim which is inconsistent with appellant's contention that the contract of sale was rescinded), no such sale took place, Mrs. Levin was not a dealer (see discussion in fn. 11), and she acted in good faith. Absent wrongful intent (which would presuppose knowledge Mrs. Levin did not have), she cannot be said to have herself aided or abetted, or conspired, and therefore to have committed as a principal an act which the General Assembly has clearly not meant to make wrongful as to her.

Nor may the clean hands doctrine be invoked to perpetuate a greater inequity, or on merely technical grounds. Equity looks to the substance of a matter, and to the consequences. Appellant cannot assert the hypothetical rights of a non-existent third-party, where, moreover, had such a subsequent purchaser been found, equity would surely have protected him by protecting Mrs. Levin's intervening right to title, that she might meet her own legal obligations.

of Comm'rs on Unif. State Laws in cooperation with the A. L. I.) to expressly provide that R. C. 1309.26 not apply in motor vehicle title cases. It neglected to limit the applicability of R. C. 1309.31, or of R. C. 1309.29. A conflict can arise in at least two instances: (1) where R. C. 1309.31 would give priority to a subsequent purchase money security interest, and (2) where R. C. 1309.29 gives priority to an artisan's lien though not perfected.

Neither conflict is of direct concern here, but it is significant that the Supreme Court has held that R. C. 4505.13 should be treated as a special statutory provision relating to a specific subject matter, and as therefore controlling over R. C. 1309.29. *Commonwealth Loan Co.* v. *Berry* (1965), 2 Ohio St. 2d 169; *Snyder* v *Ryan* (1965), 2 Ohio St. 2d 171. The apparent problem manifest in R. C. 1309.31 (C) and (D) is resolved if the limitation found in R. C. 1309.26(C) is read as intended to limit not just the literal effect, but the functional purpose of R. C. 1309.26(A) and (B) in its relation to Chapter 1309.

The most that can be argued here is that the omission of the phrase "subsequent purchaser" from the second of the two clauses of R. C. 4505.13 construed in the *Kozoil* case reflects a legislative intent that the common law and judicial interpretation of pre-existing authority should continue under Chapter 4505, but that this underlying body of law has been swept away and supplanted by the U. C. C. as adopted. But is this so?

Certainly R. C. 1309.16 was meant to repudiate the rule in *Benedict* v. *Ratner* (1925), 268 U. S. 353, 69 L. Ed. 991. *Cf.* Uniform Commercial Code Sec. 9-205, Comments.[13] But R. C. 1309.16 is applicable only within its

---

[13]As stated in Comment 1,

"* * * [The Code] expressly validates the floating charge or lien on a shifting stock. * * *. This Section provides that a security interest is not invalid or fraudulent by reason of liberty in the debtor to dispose of the collateral without being required to account for proceeds or substitute new collateral. It repeals the rule of *Benedict* v. *Ratner* * * *, and other cases which held such arrangements void as a matter of law because the debtor was given unfettered dominion or control over the collateral. * * *."

terms. It provides, in material part, that

"A security interest is not invalid or fraudulent against creditors by reason of liberty in the debtor to use, commingle, or dispose of all or part of the collateral * * * or to collect or compromise accounts, contract rights, or chattel paper, or to accept the return of goods or make repossessions, or to use, commingle, or dispose of proceeds, or by reason of the failure of the secured party to require the debtor to account for proceeds or replace collateral. * * *."

The appellee is not a creditor; she is a buyer. *Cf.* R. C. 1301.01(L). And but for R. C. 1309.26(C), she would be protected under R. C. 1309.26(A), which is to say that R. C. 1309.16 and R. C. 1309.26(A) are functionally interrelated and should be read in *pari materia*. The latter provides that

"A buyer in the ordinary course of business * * * takes free of a security interest created by his seller *even though the security interest is perfected* and even though the buyer knows of its existence." (*Cf.* R. C. 1301.01(I), defining the term "buyer in the ordinary course of business." (Emphasis added.)

Even while R. C. 1309.16 repudiates the *Benedict* rule as against creditors, the protection afforded the purchaser in the ordinary course of business is expanded to provide absolute protection limited in Ohio to cases other than purchases of a motor vehicle. It cannot from this be concluded that the buyer is left unprotected, only that the Commercial Code, as adopted, fails to speak to the issue. Recourse must be had to the common law and other statutory law, *i. e.*, to the law as interpreted in the *Kozoil* case.

Accordingly, both of appellant's two assignments of error are overruled. The judgment of the trial court is affirmed.

*Judgment affirmed.*

Manos, C. J., and Day, J., concur.